# STATE OF MICHIGAN

# COURT OF APPEALS

ESTATE OF EZEKIEL D. GOODWIN, by
REBECCA R. GOODWIN, Personal
Representative,

       Plaintiff-Appellee,

and

JEFF GOODWIN,

       Plaintiff,

v

NORTHWEST MICHIGAN FAIR
ASSOCIATION,

       Defendant-Appellant,

and

TAD M. THOMPSON, TMT, INC., MEAGHAN
ELISABETH THOMPSON, and SUBWAY
STORE,

       Defendants.

FOR PUBLICATION
July 3, 2018
9:00 a.m.

No. 333963
Grand Traverse Circuit Court
LC No. 2015-030872-NI

ESTATE OF EZEKIEL D. GOODWIN, by
REBECCA R. GOODWIN, Personal
Representative,

       Plaintiff-Appellee/Cross-Appellant,

and

JEFF GOODWIN,

       Plaintiff,

v

NORTHWEST MICHIGAN FAIR

No. 335292
Grand Traverse Circuit Court
LC No. 2015-030872-NI

ASSOCIATION,

> Defendant-Appellant/Cross-
> Appellee,

and

TAD M. THOMPSON, TMT, INC., MEAGHAN
ELISABETH THOMPSON, and SUBWAY
STORE,

> Defendants.

---

Before: MURRAY, P.J., and HOEKSTRA and GADOLA, JJ.

PER CURIAM.

These consolidated appeals involve a wrongful death action filed by plaintiff Rebecca Goodwin as personal representative of Ezekiel Goodwin's estate. Following a jury trial, the trial court entered a judgment against defendant Northwest Michigan Fair Association[1] in the amount of $1,000,000. Later, the trial court also entered an order awarding plaintiff taxable costs and prejudgment interest. Defendant now appeals as of right. For the reasons explained in this opinion, we conclude that the trial court erred by denying defendant's request to name Jeff Goodwin as a nonparty at fault and that on the facts of this case, failure to vacate the jury verdict would be inconsistent with substantial justice. Accordingly, we vacate the judgment in plaintiff's favor, we vacate the award of taxable costs and prejudgment interest, and we remand for a new trial.

## I. FACTS

On August 8, 2012, while riding his bike, 6-year-old Ezekiel Goodwin was hit by a truck driven by Tad Thompson. The accident occurred on a service drive on defendant's 80-acre fairground property during "fair week," an event featuring a carnival and amusement rides as well as 4-H Club animal exhibitions and activities. Children and young adults ranging in age from 5 to 19-years-old participated in the 4-H events, and many of the children and their families

---

[1] Plaintiff also sued Tad Thompson, the driver of the vehicle which killed Ezekiel, as well as Thompson's wife and Thompson's employer, TMT, Inc., which operates a Subway restaurant franchise. However, plaintiff reached a settlement with these defendants, and by stipulation of the parties these defendants were dismissed with prejudice. These defendants are not parties to this appeal. As used in this opinion, the term "defendant" will refer solely to defendant Northwest Michigan Fair Association.

camped on-site during the week.[2]  Between the campground area and the animal barns there was a private service drive, and it was on this service drive that Ezekiel was struck.

During fair week, pedestrians and bicycle riders, including children, used the service drive to travel from the campground area to the barns.  Fair organizers were aware that pedestrians and bike riders used the service drive.  However, unlike other roads on the property, the service drive was *not* closed to motor vehicle traffic during fair week.  Motor vehicle use of the service drive was restricted insofar as only people with passes could drive onto the fairgrounds and the speed limit on the fairgrounds was 5½ miles per hour.  Those with passes would include 4-H families, the members of the fair board, and service vehicles related to the fair such as vehicles hauling manure, emptying dumpsters, and tending outhouse facilities.  Emergency vehicles could also use the drive if necessary.  In other words, the service drive saw bicycle and pedestrian traffic as well as "intermittent" motor vehicle traffic during the fair.

Ezekiel and his siblings were participating in 4-H events, and Ezekiel and members of his family—his father Jeff Goodwin, his sister, and his brother—were camping at the fairgrounds.  On the morning of August 8, 2012, Jeff allowed Ezekiel to ride his bike, unaccompanied, from the family's campsite to the barns where Ezekiel planned to tend to his pony.  Jeff was going to the bathhouse, and after shaving and brushing his teeth, he intended to meet Ezekiel at the barns.  As Ezekiel was leaving, Jeff told Ezekiel that he would meet him at the door to the pony stall.[3]

Thompson had a pass to drive on the fairgrounds because he had a daughter participating in 4-H events, and on the morning of August 8, 2012, he drove his daughter to the fairgrounds, where she planned to feed her cow.  While driving on the service drive toward the animal barns, Thompson saw Ezekiel riding his bicycle on the road.  After passing Ezekiel, Thompson's daughter reminded him that he forgot to stop at the feed lot.  Thompson checked his mirrors and then began to back up.  Unbeknownst to Thompson, Ezekiel was behind his truck in a blind spot, where someone of Ezekiel's height would not be visible on a bike.  According to an eyewitness to the accident, Ezekiel sat on his bike and appeared to just watch the truck slowly back-up into him.  Tragically, Ezekiel was pinned beneath the truck, and he later died of his injuries.

Following Ezekiel's death, Ezekiel's mother, Rebecca Goodwin, as the personal representative of Ezekiel's estate, filed the current wrongful death lawsuit against defendant.  Plaintiff's basic theory of the case was that the service drive was unreasonably dangerous because defendant allowed motor vehicle traffic on a path used by pedestrians and bike riders.  According to plaintiff, defendant should have banned all motor vehicles, used "spotters" for vehicles, or erected barriers to create a separate bike path.

---

[2] The fair rules required children to have "one parent per family on site."

[3] Ezekiel was among the youngest class of 4-H members, known as "clover buds."  As a clover bud, Ezekiel could not enter the pony stall unless accompanied by an adult.

Notably, defendant maintained that Jeff was negligent in his supervision of Ezekiel, and defendant attempted to name Jeff as a nonparty at fault.[4] The trial court ultimately denied defendant's request, reasoning that the jury could not consider Jeff's potential fault because Jeff was entitled to parental immunity. Consistent with this ruling, the trial court instructed the jury that it could not consider whether Ezekiel's parents were negligent, and the jury was told to apportion 100% of the fault between defendant and Thompson.

Following trial, the jury returned a verdict in favor of plaintiff on a "premises liability/nuisance" theory.[5] With regard to Thompson, the jury concluded that he had been negligent. The jury then apportioned 50% of the fault to defendant and 50% of the fault to Thompson. In terms of damages, the jury awarded a total of $2,000,000 in damages. Based on the jury's verdict, the trial court entered an order against defendant for 50% of the damages, i.e., $1,000,000. After trial, the trial court also awarded plaintiff taxable costs under MCR 2.625 and prejudgment interest under MCL 600.6013(8).

Defendant now appeals as of right. Specifically, in Docket No. 335963, defendant challenges the jury verdict and the judgment in plaintiff's favor. Plaintiff has filed a cross-appeal in Docket No. 335963. In Docket No. 335292, defendant challenges the trial court's award of costs and prejudgment interest.

## II. NONPARTY AT FAULT

On appeal, defendant first argues that a new trial should be granted because the trial court refused to allow the jury to consider Jeff as a nonparty at fault. Although Jeff is entitled to parental immunity from a lawsuit by Ezekiel or Ezekiel's estate, defendant maintains that this grant of immunity does not eliminate Jeff's parental duty to supervise Ezekiel, and because of this duty, defendant argues that Jeff may be named as nonparty at fault for purposes of determining defendant's "fair share" of liability. Defendant also argues that there is substantial evidence that Jeff was negligent in his supervision of Ezekiel and that this negligence was a

---

[4] Initially, Jeff was a named plaintiff in the case. As an individual plaintiff, he alleged a claim of negligent infliction of emotional distress (NIED). He later dropped his NIED claim after admitting that he did not see the accident and that he did not see Ezekiel removed from under the vehicle. Defendant filed its notice of nonparty fault regarding Jeff as soon as Jeff dropped his claim and became a nonparty. See *Salter v Patton*, 261 Mich App 559, 567; 682 NW2d 537 (2004); MCR 2.112(K)(3)(c).

[5] Plaintiff also brought a claim of negligence, but the jury rejected this claim. With regard to the "premises liability/nuisance" count, the jury was instructed on a premises liability theory consistent with M Civ JI 19.03. The instruction as it related to "nuisance" was likewise premised on the assertion that there was a dangerous condition on the land and that defendant acted negligently by failing to protect Ezekiel from this condition. Despite the added "nuisance" label, the claim was in substance a premises liability claim—namely, that Ezekiel was injured because of an unreasonably dangerous condition on defendant's land. See *Buhalis v Trinity Continuing Care Servs*, 296 Mich App 685, 692-693; 822 NW2d 254 (2012).

proximate cause of Ezekiel's death. According to defendant, a new trial is required to allow the jury to consider whether Jeff was negligent and to apportion fault to Jeff on the basis of his negligence. We agree.

## A. STANDARDS OF REVIEW

"Statutory construction is a question of law subject to review de novo." *Vandonkelaar v Kid's Kourt, LLC*, 290 Mich App 187, 196; 800 NW2d 760 (2010). Likewise, whether a duty exists is a question of law, which is reviewed de novo. *Hill v Sears, Roebuck & Co*, 492 Mich 651, 659; 822 NW2d 190 (2012). If the trial court erred by refusing to allow the jury to consider Jeff's alleged negligence when apportioning fault, reversal is not required unless failure to vacate the jury verdict would be inconsistent with substantial justice. MCR 2.613(A); *Pontiac Sch Dist v Miller, Canfield, Paddock & Stone*, 221 Mich App 602, 630; 563 NW2d 693 (1997).

## B. ANALYSIS

Traditionally, Michigan followed a joint and several liability approach in tort cases involving multiple tortfeasors. *Kaiser v Allen*, 480 Mich 31, 37; 746 NW2d 92 (2008). Under this approach, "the injured party could either sue all tortfeasors jointly or he could sue any individual tortfeasor severally, and each individual tortfeasor was liable for the entire judgment, although the injured party was entitled to full compensation only once." *Gerling Konzern Allgemeine Versicherungs AG v Lawson*, 472 Mich 44, 49; 693 NW2d 149 (2005). A defendant's liability for the entire judgment existed even when one of the tortfeasors could not be held civilly responsible because of immunity. *Bell v Ren-Pharm, Inc*, 269 Mich App 464, 470; 713 NW2d 285 (2006). "In such a situation, a [defendant] who is not immune and who is subject to suit is jointly and severally liable for damages arising out of the acts of a person not named as a party because of some immunity protection." *Id*.

However, in 1995, the Legislature enacted tort-reform legislation that "generally abolished joint and several liability and replaced it with fair share liability where each tortfeasor only pays the portion of the total damages award that reflects that tortfeasor's percentage of fault." *Id*. at 467 (quotation marks and citation omitted). These principles of fair share liability are set forth in the comparative-fault statutes: MCL 600.2956, MCL 600.2957, and MCL 600.6304. *Vandonkelaar*, 290 Mich App at 190 n 1. In particular, under MCL 600.2956, "[e]xcept as provided in section 6304, in an action based on tort or another legal theory seeking damages for personal injury, property damage, or wrongful death, the liability of each defendant for damages is several only and is not joint." In relevant part, MCL 600.2957 provides:

> (1) In an action based on tort or another legal theory seeking damages for personal injury, property damage, or wrongful death, the liability of each person shall be allocated under this section by the trier of fact and, subject to section 6304, in direct proportion to the person's percentage of fault. In assessing percentages of fault under this subsection, the trier of fact shall consider the fault of each person, *regardless of whether the person is, or could have been, named as a party to the action*.

\* \* \*

(3) Sections 2956 to 2960 do not eliminate or diminish a defense or immunity that currently exists, except as expressly provided in those sections. *Assessments of percentages of fault for nonparties are used only to accurately determine the fault of named parties. If fault is assessed against a nonparty, a finding of fault does not subject the nonparty to liability in that action and shall not be introduced as evidence of liability in another action.* [Emphasis added.]

Section 6304 states:

(1) In an action based on tort or another legal theory seeking damages for personal injury, property damage, or wrongful death involving fault of more than 1 person, including third-party defendants and nonparties, the court, unless otherwise agreed by all parties to the action, shall instruct the jury to answer special interrogatories or, if there is no jury, shall make findings indicating both of the following:

(a) The total amount of each plaintiff's damages.

(b) The percentage of the total fault of *all* persons that contributed to the death or injury, including each plaintiff and each person released from liability under section 2925d, *regardless of whether the person was or could have been named as a party to the action.*

(2) In determining the percentages of fault under subsection (1)(b), the trier of fact shall consider both the nature of the conduct of each person at fault and the extent of the causal relation between the conduct and the damages claimed.

\* \* \*

(4) Liability in an action to which this section applies is several only and not joint. Except as otherwise provided in subsection (6) [in medical malpractice cases], *a person shall not be required to pay damages in an amount greater than his or her percentage of fault* as found under subsection (1). . . .

\* \* \*

(8) As used in this section, "fault" includes an act, an omission, conduct, including intentional conduct, a breach of warranty, or a breach of a legal duty, or any conduct that could give rise to the imposition of strict liability, that is a proximate cause of damage sustained by a party. [Emphasis added.]

As made plain in these provisions, the fact-finder must "allocate fault among all responsible torfeasors," regardless of whether the tortfeasor was or could have been named as a party to the action, and "each tortfeasor need not pay damages in an amount greater than his allocated percentage of fault." *Gerling*, 472 Mich at 51. See also *Barnett v Hidalgo*, 478 Mich 151, 167; 732 NW2d 472 (2007). However, when there is an assertion that a person's negligence is a proximate cause of the damage sustained by a plaintiff, before fault may be allocated to that person under the comparative fault statutes, there must be proof that the person owed a legal duty

to the injured party. *Romain v Frankenmuth Mut Ins Co*, 483 Mich 18, 21-22; 762 NW2d 911 (2009). "Without owing a duty to the injured party, the 'negligent' actor could not have proximately caused the injury and could not be at 'fault' for purposes of the comparative fault statutes." *Id*. at 22.

### i. PARENTAL DUTY TO SUPERVISE

Before fault may be apportioned to Jeff, there must be a threshold determination that Jeff owed Ezekiel a duty. *Id.* at 21-22. "Duty is essentially a question of whether the relationship between the actor and the injured person gives rise to any legal obligation on the actor's part for the benefit of the injured person." *Moning v Alfono*, 400 Mich 425, 438-439; 254 NW2d 759 (1977). Michigan has long recognized that "both nature and law impose" on parents "the duty of care and watchfulness" with regard to their children. *Ryan v Towar*, 128 Mich 463, 479; 87 NW 644 (1901). See also *Lyshak v Detroit*, 351 Mich 230, 234; 88 NW2d 596 (1958). As persons responsible for their children, parents cannot allow their children "too young to understand danger" to wander unattended; rather, parents, as persons with "special dealings" with children, are expected to provide care and protection. *Hoover v Detroit, GH & M Ry Co*, 188 Mich 313, 321-323; 154 NW 94 (1915). Stated differently, "parents have a duty to supervise their own children, or determine that their children are of sufficient age and maturity to no longer need such supervision." *Stopczynski v Woodcox*, 258 Mich App 226, 236; 671 NW2d 119 (2003) (quotation marks and citation omitted). This duty to supervise one's child includes an obligation "to see that the child's behavior does not involve danger to the child," 62 Am Jur, 2d, Premises Liability § 227, or to other persons, *American States Ins Co v Albin*, 118 Mich App 201, 206; 324 NW2d 574 (1982).[6] Parents are expected to exercise "reasonable care" to "control" their minor child and to provide "instructions and education" to ensure that the child is aware of dangers to his or her well-being. See *Reinert v Dolezel*, 147 Mich App 149, 157; 383 NW2d 148 (1985); *McCallister v Sun Valley Pools, Inc*, 100 Mich App 131, 139; 298 NW2d 687 (1980); *Rodebaugh v Grand Trunk W R Co*, 4 Mich App 559, 567; 145 NW2d 401 (1966). Generally, unless the parent entrusts the child to another person who agrees to assume the duty to supervise the child, the parent's duty to supervise extends to exercising reasonable care for the safety of the child while on the property of another, including an obligation to protect and guard the child against dangers that are open and obvious to the parent.[7] See 62 Am Jur, 2d, Premises Liability

---

[6] With regard to other persons, "a parent is under a duty to exercise reasonable care so to control his minor children as to prevent them from intentionally harming others or from so conducting themselves as to create an unreasonable risk of bodily harm to them if the parent knows or has reason to know that he has the ability to control his children and knows or should know of the necessity and opportunity for exercising such control." *American States*, 118 Mich App at 206.

[7] Although parents have a duty to supervise their children, a parent's presence on the property does not abrogate the duty a premises owner owes to children. See *Woodman v Kera, LLC*, 280 Mich App 125, 154; 760 NW2d 641 (2008) (opinion by TALBOT, J.); see also 62 Am Jur 2d Premises Liability § 227. "[L]andowners owe a duty to exercise reasonable care to protect children from dangerous conditions on their premises notwithstanding the presence of the

§ 227 to § 229; 65A CJS, Negligence § 537; *Stopczynski*, 258 Mich App at 236. See also *Powers v Harlow*, 53 Mich 507, 516; 19 NW 257 (1884) (concluding that a father could not be found at fault for a child's injuries on the property of another because a person of "ordinary prudence" in the father's position would not have suspected the danger to the child).

## ii. PARENTAL IMMUNITY

Although parents undoubtedly have a duty to supervise their children, the law generally does not allow children to recover damages from their parents for a breach of this duty. In particular, "[a]t common law, a minor could not sue his or her parents in tort." *Haddrill v Damon*, 149 Mich App 702, 705; 386 NW2d 643 (1986). The Michigan Supreme Court generally abolished intra-family tort immunity in *Plumley v Klein*, 388 Mich 1, 8; 199 NW2d 169 (1972), holding that a child could maintain a lawsuit against his or her parents for an injury resulting from a parent's negligence. However, the *Plumley* Court retained two exceptions to this rule, concluding that parental immunity remained:

> (1) where the alleged negligent act involves an exercise of reasonable parental authority over the child; and (2) where the alleged negligent act involves an exercise of reasonable parental discretion with respect to the provision of food, clothing, housing, medical and dental services, and other care. [*Id.*]

A claim for negligent parental supervision of a child falls within the first *Plumley* exception, meaning that a parent is granted immunity and a child may not sue a parent for negligent supervision. See *Spikes v Banks*, 231 Mich App 341, 349; 586 NW2d 106 (1998); *McCallister*, 100 Mich App at 139.

## iii. APPORTIONING FAULT TO IMMUNE PARENTS

In this case, the trial court acknowledged that Jeff, as Ezekiel's parent, generally owed Ezekiel a duty to supervise him; however, the trial court precluded the jury from considering Jeff's alleged negligence, or apportioning fault to Jeff, based on the conclusion that Jeff's entitlement to parental immunity barred the jury's consideration of his fault. In reaching this conclusion, the trial court distinguished between a "duty" and a "legally cognizable duty that can serve as a basis for allocation of fault," and the trial court focused its analysis on whether the comparative fault statutes allowed for recovery against parents, noting for instance that the statutes did not address "what is the legal duty, the duty that you can recover against with respect to a parent and a child in a wrongful death case." In light of the trial court's reasoning, the basic question before us is whether immunity, specifically parental immunity, bars the allocation of fault to an immune individual under the comparative fault statutes. In contrast to the trial court's conclusions, given the plain language of the comparative fault statutes and the distinction between immunity and duty, we conclude that a person entitled to parental immunity may

---

children's parents." *Wheeler v Cent Mich Inns, Inc*, 292 Mich App 300, 304; 807 NW2d 909 (2011).

nevertheless be named as a nonparty at fault and allocated fault for purposes of determining a defendant's liability under the comparative fault statutes.

First of all, the trial court erred by focusing on whether Ezekiel's estate could obtain a recovery against Jeff. Quite simply, under MCL 600.2957 and MCL 600.6304, the allocation of fault is not dependent on whether a plaintiff can recover damages from the nonparty. Following the enactment of tort-reform legislation, the finder of fact must allocate fault among *all* responsible persons, "regardless of whether the person is, or could have been, named as a party to the action." MCL 600.2957(1). See also MCL 600.6304(1)(b). A finding that a nonparty is at fault "does not subject the nonparty to liability." MCL 600.2957(3). Rather, the sole purpose of assessing the fault of nonparties is to "accurately determine the fault of named parties," MCL 600.2957(3), to ensure that each named defendant-tortfeasor does not "pay damages in an amount greater than his allocated percentage of fault," *Gerling*, 472 Mich at 51. In other words, the nonparty's "liability" to the plaintiff is not at issue under the comparative fault statutes and it is immaterial whether a plaintiff could have named the nonparty as a defendant.

There is thus no merit to the trial court's suggestion that the allocation of fault under MCL 600.2957 and MCL 600.6304 depends on the plaintiff's ability to obtain a recovery against the nonparty at fault; such an interpretation has no basis in the statutory language and it wholly eviscerates the requirement that a person's fault should be considered "regardless of whether the person is, or could have been, named as a party to the action." MCL 600.2957(1). See also MCL 600.6304(1)(b). Accordingly, while the trial court correctly noted that a child cannot recover against a parent for negligent supervision, this inability to recover damages against a parent in no way precludes an assessment of a parent's fault for purposes of accurately determining a defendant's liability and ensuring that a defendant only pays his or her fair share.[8] Rather than focus on whether a child could "recover" against a parent, the threshold question the trial court should have considered under MCL 600.2957 and MCL 600.6304 was whether Jeff owed a duty to his child. See *Romain*, 483 Mich at 21-22.

Second, to the extent the trial court attempted to analyze the duty question, it erred by injecting the concept of immunity into the threshold duty determination and using the parental immunity doctrine to determine whether there was a duty that could be considered for purposes of allocating fault. In actuality a parent may have a duty—and thus may be allocated fault under MCL 600.2957 and MCL 600.6304—regardless of whether the parent is entitled to immunity. Generally speaking, the question of whether a duty exists is a separate and distinct inquiry from

---

[8] Before the enactment of the tort-reform statutes, the fact that parental immunity prevented a child from suing a parent for negligent supervision also prevented consideration of a parent's fault in a lawsuit brought by the child or the child's estate. See *Byrne v Schneider's Iron & Metal, Inc*, 190 Mich App 176, 189; 475 NW2d 854 (1991); *Wymer v Holmes*, 144 Mich App 192, 196; 375 NW2d 384 (1985). The trial court relied on these cases when ruling that Jeff could not be named as a nonparty at fault. However, these cases did not involve consideration of the statutes that now control the allocation of fault in tort suits and thus these cases have no bearing on the propriety of considering parental fault under MCL 600.2957 and MCL 600.6304.

whether an individual is immune from liability for a breach of that duty. See *McGoldrick v Holiday Amusements, Inc*, 242 Mich App 286, 298 n 5; 618 NW2d 98 (2000); *Jones v Wilcox*, 190 Mich App 564, 569-570; 476 NW2d 473 (1991). For example, this distinction between duty and immunity was recognized by the Michigan Supreme Court, in the context of governmental immunity, as follows:

> Because immunity necessarily implies that a "wrong" has occurred, we are cognizant that some tort claims, against a governmental agency, will inevitably go unremedied. Although governmental agencies may be under many duties, with regard to services they provide to the public, only those enumerated within the statutorily created exceptions are legally compensable if breached. [*Nawrocki v Macomb Co Rd Com'n*, 463 Mich 143, 157; 615 NW2d 702 (2000).]

Similarly, in the context of parental immunity, this Court has acknowledged the distinction between a grant of immunity and a determination regarding the existence of a duty, recognizing that "[t]he logical predicate to the [parental] immunity question . . . is an assumption that the [parent's] conduct was negligent, and hence unreasonable; the issue is whether the parent should be shielded from liability for that unreasonable conduct." *Thelen v Thelen*, 174 Mich App 380, 384 n 1; 435 NW2d 495 (1989). See also *Spikes*, 231 Mich App at 348-349. Indeed, while traditionally a parent's negligence was not a basis to reduce a *child's* recovery in a lawsuit against a third-party tortfeasor, a finding of parental negligence—i.e., a determination that a parent breached a duty—has long been considered as a basis to reduce or foreclose a *parent's* recovery in a lawsuit by the parent based on the loss of a child's services, society, and companionship. See *Feldman v Detroit United Ry*, 162 Mich 486, 489; 127 NW 687 (1910); *Byrne*, 190 Mich App at 189.[9] As these cases make plain, while a parent may be immune from a lawsuit by his or her child or the child's estate, a parent nevertheless owes a duty to the child. In other words, contrary to the trial court's attempt to define a parent's duty based on parental

---

[9] In analyzing the parental fault question, the trial court indicated that as a matter of public policy, juries should not be allowed to pass judgment on parental decisions. Parental immunity serves a number of purposes, including "preservation of domestic tranquility and family unity, protection of family resources, and recognition of the need to avoid judicial intervention into the core of parenthood and parental discipline." *Hush v Devilbiss Co*, 77 Mich App 639, 645; 259 NW2d 170 (1977). However, contrary to the trial court's reasoning, there have long been circumstances when a parent's negligence was considered by the finder of fact. See, e.g., *Feldman*, 162 Mich at 489; *Byrne*, 190 Mich App at 185-189. More importantly, it would be improper to use policy concerns as a reason to prevent consideration of a parent's fault under MCL 600.2957 and MCL 600.6304. When interpreting statutory language, our obligation is to enforce statutes as written, not "to independently assess what would be most fair or just or best public policy." *Tull v WTF, Inc*, 268 Mich App 24, 36; 706 NW2d 439 (2005) (quotation marks and citations omitted). In other words, the question before us is whether MCL 600.2957 and MCL 600.6304 require consideration of parental fault, not whether consideration of parental fault is the best public policy.

immunity, "the availability of an immunity has no bearing on whether a duty exists, but rather focuses on redressability." *Vandonkelaar*, 290 Mich App at 212 (MURRAY, J., dissenting).[10]

Consistent with this distinction between duty and immunity, the comparative fault statutes make plain that the availability of immunity does not control the existence of a duty that can give rise to an allocation of fault to a nonparty under MCL 600.2957 and MCL 600.6304. That is, while preserving any immunity held by a nonparty, the statutes allow for consideration of a nonparty's fault for a breach of duty, regardless of whether immunity would preclude a plaintiff from naming the immune person as a party. See MCL 600.2957(1); MCL 600.6304(3), (8). More fully, Judge Murray's dissenting opinion in *Vandonkelaar* aptly examines this distinction between immunity and duty as well as the implications of immunity in the comparative fault statutes as follows:

> Concerning immunity, MCL 600.2957(3) provides:
>
>> Sections 2956 to 2960 [MCL 600.2956 to MCL 600.2960] *do not eliminate or diminish a defense or immunity that currently exists,* except as expressly provided in those sections. Assessments of percentages of fault for nonparties are used only to accurately determine the fault of named parties. If fault is assessed against a nonparty, a finding of fault does not subject the nonparty to liability in that action and shall not be introduced as evidence of liability in another action. [Emphasis supplied.]
>
> By stating that a fact-finder's assessment of the percentage of a nonparty's fault does not eliminate or diminish an immunity, § 2957(3) necessarily presupposes that an immunity does not abrogate a duty. Otherwise, there would be no need to preserve that immunity after fault has been allocated. Put differently, if an immunity were to abrogate a duty, an allocation of fault could never come into play because as *Romain* held, a nonparty's duty is necessary to allocate nonparty fault in the first place. Without an allocation of fault, no predicate would exist to eliminate the immunity § 2957(3) otherwise seeks to preserve. [*Vandonkelaar*, 290 Mich App at 212-113 (MURRAY, J., *dissenting*).]

Overall, given the clear distinction between immunity and duty, and bearing in mind that fault may be apportioned when there is a duty regardless of whether the person may be named as a

---

[10] The question of whether immune parents may be named as non-parties at fault was raised in *Vandonkelaar*, 290 Mich App at 191. However, the *Vandonkelaar* majority did not decide the issue. *Id*. at 195. In a dissenting opinion, Judge Murray addressed the question of parental immunity in the context of the comparative fault statutes and concluded that parental immunity does not eliminate parental duty, meaning that this immunity would not preclude consideration of parental fault for purposes of allocating responsibility under the comparative fault statutes. *Id*. at 209-216 (MURRAY, J., dissenting). We find Judge Murray's decision persuasive and we adopt its reasoning.

party, there is simply no basis for the trial court's conclusion that parental immunity prohibits the consideration of a parent's fault under MCL 600.2957 and MCL 600.6304.[11]

## iv. APPLICATION

Having concluded that a parent can be named as a nonparty at fault notwithstanding the parental immunity doctrine, the question before us becomes whether Jeff should have been named as a nonparty at fault in this case and if so, whether the refusal to allow the jury to consider Jeff's alleged negligence warrants a new trial. In this regard, despite defendant's request to include Jeff as a nonparty at fault, the jury was given a verdict form which required them to assign 100% of the fault for Ezekiel's death and the jury was only given the option of apportioning that fault between defendant and Thompson. Indeed, under M Civ JI 13.09,[12] the trial court affirmatively instructed the jury *not* to consider any negligence by Ezekiel's parents. By denying defendant's request to include Jeff as a nonparty at fault and omitting Jeff's name from the verdict form, the trial court denied defendant one of its primary defenses—namely, that Jeff was negligent in allowing a six-year-old child to ride his bike unescorted on a road open to intermittent motor vehicle traffic.

Moreover, this error cannot be considered harmless given that there was evidence to support the conclusion that Jeff breached a duty to Ezekiel and that this breach of duty was a proximate cause of Ezekiel's death. As Ezekiel's parent, Jeff owed Ezekiel a duty of supervision and a duty to protect him from open and obvious dangers on the property. *Lyshak*, 351 Mich at 234; *Stopczynski*, 258 Mich App at 236; 62 Am Jur, 2d, Premises Liability § 227. In this case, the purportedly dangerous condition on defendant's property was the mixed-use nature of the service drive, i.e., intermittent motor vehicle traffic on a road that campers also used to traverse from the campgrounds to the barns on their bikes or on foot. Faced with this mixed-use roadway, Jeff allowed 6-year-old Ezekiel to ride his bike alone, from the family's campsite to the barn.[13] Jeff's only justification for this decision was his assertion that he believed there was an unwritten rule that the service drive was a "bike path" that was not open to traffic during the fair.

---

[11] While non-binding, several other jurisdictions have similarly determined that, notwithstanding parental immunity, parents owe their children a duty and thus parental negligence may be considered when allocating fault. See, e.g., *Doering v Copper Mountain, Inc*, 259 F3d 1202, 1216 (CA 10, 2001); *Witte v Mundy*, 820 NE2d 128, 133 (Ind, 2005); *Fitzpatrick v Allen*, 24 Kan App 2d 896, 904; 955 P2d 141, 148 (1998); *YH Investments, Inc v Godales*, 690 So 2d 1273, 1278 (Fla, 1997). We find these cases persuasive.

[12] M Civ JI 13.09 states: "You must not consider whether there was negligence on the part of [ *name of child* ]'s parents, because, under the law, any negligence on the part of the parents cannot affect a claim on behalf of the child." This instruction is inapplicable when a parent is named as a nonparty at fault. See M Civ JI 13.09, use notes.

[13] Jeff never denied that he was responsible for supervising Ezekiel, and testimony from parents and organizers confirmed that parents were generally responsible for their children while at the fair. Indeed, several parents described entrusting their children to other adults if they could not supervise them personally.

Indeed, Jeff testified that he would never have let his 6-year-old ride a bike alone on a road that was open for traffic; rather, Jeff stated that he would have accompanied Ezekiel to the barn.

However, despite Jeff's claim that he thought the road was closed to motor vehicle traffic, in his trial testimony, Jeff conceded that, though "rare," he actually saw motor vehicles on the service drive. Additionally, he knew that there were "official" vehicles going to the barns, and more than once, Jeff saw an unofficial red convertible parked at the barn with hay in its trunk. Aside from seeing the "rare" vehicle on the road, Jeff also acknowledged that there were no signs or barriers prohibiting vehicles from driving on the service road, that numerous vehicles were parked along the service drive (though Jeff asserted that he did not believe these vehicles would move), and that, more generally, campers with vehicles parked on the campgrounds could come and go with their vehicles during the week. Likewise, other campers testified that they used the road to walk and ride to the barn, but they also confirmed that they saw vehicles using the drive, including garbage trucks, a backhoe or other vehicles gathering manure, golf carts, "Gators," and people coming to tend to the porta-potties. The testimony of the fair organizers also indicated that, unlike other roadways on the property, the service drive was not closed to motor vehicles.

Given Jeff's admissions and the other evidence of vehicles using the road, Jeff clearly knew—or would have been reasonably expected to know—that there was intermittent motor vehicle traffic on the service drive. Yet, Jeff allowed a six-year-old to ride on the service drive unaccompanied. Bearing in mind "the immaturity, inexperience and carelessness of children," reasonable minds could well conclude that a six-year-old should not have been on the roadway unsupervised. See *Moning*, 400 Mich at 446. Cf. *Feldman*, 162 Mich at 490; *Price v Manistique Area Pub Sch*, 54 Mich App 127, 132; 220 NW2d 325 (1974). In other words, Jeff's decision to allow Ezekiel to ride alone could be considered a breach of Jeff's duty to supervise his child. Indeed, plaintiff's theory of the case was that defendant was unreasonable in allowing even intermittent motor vehicle traffic on a road used by child bicyclists; and if such a purportedly dangerous condition poses an "unreasonable risk of harm" to support a premises liability claim, see *Hoffner v Lanctoe*, 492 Mich 450, 460; 821 NW2d 88 (2012), it is challenging to see how a parent could not be considered negligent in allowing a six-year-old to confront this danger alone when the parent knew or should have known of intermittent motor vehicle traffic on the roadway. See 62 Am Jur, 2d, Premises Liability § 227. Ultimately, there is a question of fact regarding Jeff's negligence that the jury should have been allowed to resolve.[14] See *Case v*

---

[14] In the trial court, plaintiff moved for a directed verdict on the issue of Jeff's fault, asserting that naming Jeff as a nonparty at fault was inappropriate as a factual matter because there was no evidence that Jeff was negligent. The trial court denied the motion, concluding that if a parent could be named as a nonparty at fault, there was sufficient evidence of Jeff's fault to submit the matter to a jury. On cross-appeal, plaintiff argues that the trial court erred by denying its motion for a directed verdict, and on appeal, plaintiff argues that any error in failing to allow the jury to consider Jeff's fault was harmless because there was no evidence of negligence. In making these arguments, plaintiff adopts the reasoning of the trial court, noting that after trial, the trial court expressed the opinion that it would be "inconceivable" that a jury would have found Jeff at fault. The trial court's "inconceivable" statement after trial wholly conflicts with the trial court's

*Consumers Power Co*, 463 Mich 1, 7; 615 NW2d 17 (2000) ("Ordinarily, it is for the jury to determine whether [an actor's] conduct fell below the general standard of care.").

Further, given the evidence at trial, the jury could also find that this act of negligence constituted a proximate cause of Ezekiel's death. Thompson struck Ezekiel while backing-up his truck at a speed of 5 mph. Thompson testified that he checked his mirrors but he did not see Ezekiel, and the accident reconstruction indicated that a child of Ezekiel's height would be in a blind spot. Rebecca testified that Ezekiel would not know how to respond to a reversing vehicle, and the eyewitness testimony indicated that Ezekiel just sat on his bike and watched Thompson back up. Taken together, this evidence supports the inference that had Jeff accompanied Ezekiel to provide supervision, the accident would not have occurred because, as an adult, Jeff would have been more visible to Thompson and as Ezekiel's parent, he would have controlled Ezekiel's response to the situation and protected Ezekiel from the obvious danger of a slowly reversing vehicle. Moreover, a car striking a child bicyclist on a mixed-use roadway is a reasonably foreseeable consequence of allowing a six-year-old to ride on the road unsupervised. Thus, Jeff's failure to supervise may be considered a proximate cause of Ezekiel's death. See generally *Haliw v Sterling Hts*, 464 Mich 297, 310; 627 NW2d 581 (2001) ("Proof of causation requires both cause in fact and legal, or proximate, cause.").

On the whole, there is significant evidence supporting the conclusion that Jeff knew or should have known that the service drive was being used by motor vehicles. In these circumstances, his decision to allow his six-year-old to ride on the road, unsupervised by an adult, can be considered a breach of duty that was a proximate cause of Ezekiel's death. Consequently, defendant was entitled to argue Jeff's fault to the jury and the jury should have been allowed to apportion fault to Jeff. See MCL 600.2957; MCL 600.6304; *Barnett*, 478 Mich at 170; *Zaremba Equip, Inc v Harco Nat'l Ins Co*, 280 Mich App 16, 34; 761 NW2d 151 (2008). Yet, the trial court refused to allow the jury to apportion fault to Jeff and affirmatively instructed the jury not to consider the negligence of Ezekiel's parents. In these circumstances, failure to vacate the judgment in plaintiff's favor and remand for a new trial would be inconsistent with

---

earlier pronouncement, on the fifth day of trial, that "[i]f we don't address the issue of parental fault and we should have it taints the entire case and it has to be tried again." Setting aside this inconsistency, there are several flaws in the trial court's reasoning and plaintiff's reliance thereon. Most notably, plaintiff's arguments and the trial court's reasoning are premised on the belief that the service drive was a "bike path," despite the considerable evidence that the service drive was open to intermittent traffic and that Jeff knew or should have known that it was open to traffic. The trial court's characterization of the road as a "bike path" simply ignores the fact that the danger posed by a mixed-use road could easily be considered an open and obvious danger to Jeff. Whether Jeff knew there was traffic on the road, whether the danger of the road was open and obvious, and whether Jeff was negligent under the circumstances are questions for the jury to resolve. See *Case v Consumers Power Co*, 463 Mich 1, 7; 615 NW2d 17 (2000). Thus, contrary to plaintiff's arguments, the trial court's refusal to allow consideration of Jeff's fault was not harmless, and plaintiff was not entitled to a directed verdict on the question of Jeff's fault. See *Alfieri v Bertorelli*, 295 Mich App 189, 192; 813 NW2d 772 (2012).

-14-

substantial justice.[15]  *Cox v Bd of Hosp Managers for City of Flint*, 467 Mich 1, 15; 651 NW2d 356 (2002).  See also *Case*, 463 Mich at 10 (concluding that reversal was warranted when jury instructions failed to present one of the defendant's primary defenses to the jury).  Consequently, we vacate the judgment in plaintiff's favor and remand for a new trial.

## III. OPEN AND OBVIOUS

Next, defendant argues that the trial court erred by refusing to instruct the jury on the open and obvious doctrine.  Specifically, defendant contends that the open and obvious doctrine should be applied to Ezekiel, meaning that defendant would have no duty to protect or warn Ezekiel of open and obvious hazards.[16]  In contrast, plaintiff argues, and the trial court concluded, that the open and obvious doctrine does not apply to children under the age of seven.

## A. STANDARDS OF REVIEW

Claims of instructional error are reviewed de novo.  *Case*, 463 Mich at 6.  "The instructions should include all the elements of the plaintiff's claims and should not omit material issues, defenses, or theories if the evidence supports them."  *Id.*  "[T]he trial court's determination that a jury instruction is accurate and applicable to the case is reviewed for an abuse of discretion."  *Hill v Hoig*, 258 Mich App 538, 540; 672 NW2d 531 (2003).  "Instructional error warrants reversal if the error resulted in such unfair prejudice to the

---

[15] On appeal, defendant's request for relief asks this Court to remand with instructions to enter judgment notwithstanding the verdict (JNOV).  Although there is clearly evidence that would allow a jury to hold Jeff at least partially at fault for Ezekiel's accident, there are questions of fact surrounding the use of the road and the reasonableness of Jeff's conduct should be evaluated by the jury in light of all the circumstances.  See *Case*, 463 Mich at 7.  Further, even if Jeff was negligent, this would not necessarily absolve defendant of its duty to Ezekiel.  See *Wheeler*, 292 Mich App at 304; *Woodman*, 280 Mich App at 154 (opinion by TALBOT, J.); see also 62 Am Jur 2d Premises Liability § 227.  Ultimately, the jury should be given the opportunity to consider the fault of all persons, including Jeff.  See *Zaremba*, 280 Mich App at 34.  Accordingly, defendant's request for JNOV or some other more conclusive relief is denied.

[16] In the trial court, defendant maintained that the open and obvious doctrine applied to Ezekiel's caretaker, meaning that the jury should have been instructed on the open and obvious doctrine in relation to whether the dangers of the road were open and obvious to Jeff and whether Jeff could be considered at fault for allowing Ezekiel to confront an open and obvious danger.  Given its conclusion that Jeff could not be named as a nonparty at fault, the trial court also concluded that the open and obvious doctrine had no applicability to Jeff.  As discussed, the trial court erred in refusing to allow the jury to consider Jeff's fault.  On remand, defendant should be given the opportunity to raise an open and obvious defense—and receive an open and obvious instruction—in terms of whether *Jeff* was negligent in allowing Ezekiel to ride unaccompanied on the service drive.  However, whether the doctrine applies to Jeff is a distinct question from whether it applies to Ezekiel.

complaining party that the failure to vacate the jury verdict would be 'inconsistent with substantial justice." *Cox*, 467 Mich at 8 (quotation marks and citation omitted).

## B. ANALYSIS

"In a premises liability action, a plaintiff must prove the elements of negligence: (1) the defendant owed the plaintiff a duty, (2) the defendant breached that duty, (3) the breach was the proximate cause of the plaintiff's injury, and (4) the plaintiff suffered damages." *Benton v Dart Props, Inc*, 270 Mich App 437, 440; 715 NW2d 335 (2006). "With regard to invitees, a landowner owes a duty to use reasonable care to protect invitees from unreasonable risks of harm posed by dangerous conditions on the owner's land." *Hoffner*, 492 Mich at 460. Integral to a landowner's duty to an invitee is whether the defect in question is "open and obvious." *Id*. (quotation marks omitted). Absent special aspects,[17] "[t]he possessor of land 'owes no duty to protect or warn' of dangers that are open and obvious because such dangers, by their nature, apprise an invitee of the potential hazard, which the invitee may then take reasonable measures to avoid." *Id*. at 460-461 (citation omitted). With regard to adult invitees, whether a danger is open and obvious is judged from an objective standard, considering "whether it is reasonable to expect that an average person with ordinary intelligence would have discovered it upon casual inspection." *Id*. at 461.

When it comes to children, this Court has recognized that the open and obvious doctrine may apply to children as young as 11-years-old. *Bragan v Symanzik*, 263 Mich App 324, 326, 328, 335; 687 NW2d 881 (2004). However, when applying the open and obvious doctrine to minors, children are not held to the same standard as an average adult of ordinary intelligence. *Id*. at 328, 335. As a general matter, the law recognizes that children can only be expected to act with "that degree of care which a *reasonably careful minor* of the age, mental capacity and experience of other similarly situated minors would exercise under the circumstances." *Id*. at 328 (quotation marks and citation omitted). In contrast, adults are expected to "exercise greater vigilance" around children, and landowners owe a "heightened duty of care" to children on their property, including children who are known trespassers or licensees. *Id*. at 328-329, 333-335. See also *Woodman*, 280 Mich App at 154 (opinion by TALBOT, J.) ("Landowners owe minor invitees the highest duty of care."). In particular, when there are children on the land, a landowner is "obligated to anticipate and take into account [the child's] propensities to inquire into or to meddle with conditions which he finds on the land, his inattention, and his inability to understand or appreciate the danger, or to protect himself against it[.]" *Bragan*, 263 Mich App at 330. Given the unique characteristics of children and the heightened duty that adults owe to children, the *Bragan* Court concluded that a child invitee cannot be held to the same "open and obvious" standard as adult invitees. *Id*. at 335. More fully, this Court reasoned:

---

[17] "[A]n open and obvious hazard that ordinarily precludes liability can have special aspects that give rise to liability in one of two ways: (1) the hazard is, in and of itself, unreasonably dangerous or (2) the hazard was rendered unreasonably dangerous because it was effectively unavoidable for the injured party." *Bullard v Oakwood Annapolis Hosp*, 308 Mich App 403, 410; 864 NW2d 591 (2014).

-16-

Based on this long history of treating children differently under the law and entitling child trespassers and licensees to a heightened duty of care, we find the instant case legally distinguishable from the line of open and obvious cases involving adult invitees. Landowners owe the greatest duty of care to invitees as a class. Even the Restatement of Torts, upon which Michigan's open and obvious doctrine was originally based, recognizes that child invitees are entitled to greater protection due to their "inability to understand or appreciate the danger, or to protect [themselves] against it." It would, therefore, be illogical to find that child invitees are entitled to less protection than child licensees or trespassers. Furthermore, as minors in Michigan are only held to the standard of care of "a reasonably careful minor," it would be similarly illogical to hold child invitees to the standard of an objective, reasonably prudent person; i.e., an adult. Accordingly, we must consider whether a dangerous condition would be open and obvious to a reasonably careful minor; that is, whether the minor would discover the danger and appreciate the risk of harm. [*Id*.]

Whether a dangerous condition is open and obvious "in the eyes of a child, and if open and obvious, whether the condition was unreasonably dangerous" in light of the presence of children are ordinarily questions for the fact-finder. *Id*. at 336.

Although *Bragan* applied a reasonable child version of the open and obvious doctrine to children, the Court did so in a case involving an 11-year-old, and the Court did not address whether the doctrine should also be applied to younger children under the age of seven. The age of seven is significant because traditionally age seven has been treated as a "dividing line" in Michigan. *Burhans v Witbeck*, 375 Mich 253, 255; 134 NW2d 225 (1965). "Children under the age of seven are presumptively incapable of committing negligent or criminal acts or intentional torts." *Bragan*, 263 Mich App at 333-334. See also *Queen Ins Co v Hammond*, 374 Mich 655, 658; 132 NW2d 792 (1965). In comparison, the capabilities of children older than seven pose "a question of fact for the jury, which is to determine it on the basis of whether the child had conducted himself as a child of his age, ability, intelligence and experience would reasonably have been expected to do under like circumstances." *Burhans*, 375 Mich at 255. See also *Woodman v Kera LLC*, 486 Mich 228, 256; 785 NW2d 1 (2010). Under the tender years rule, the law presumes that children under seven cannot be held accountable because they are "without discretion," *Baker v Alt*, 374 Mich 492, 501; 132 NW2d 614 (1965) (quotation marks and citation omitted), they are "unconscious of the nature of their acts," and they have "no appreciation of attending danger to themselves or others," *Hoover*, 188 Mich at 321. See also *Muscat v Khalil*, 150 Mich App 114, 122; 388 NW2d 267 (1986) (noting that individuals in the tender years age group lack the "intellectual capacity" to appreciate danger that would be obvious to older individuals). Under these special rules for children, "the common law protects children by creating an incentive to exercise *greater* care for minors because it *limits* a defendant's ability to escape liability on the basis of the child's contributory negligence." *Woodman*, 486 Mich at 257. The question before us in this case is whether the presumed incapabilities of children under seven also precludes a finding that it is reasonable to expect children under the age of seven to discover a dangerous condition, appreciate the danger, and take reasonable measures to avoid it.

Given Michigan's long history of treating children under the age of seven differently under the law, we conclude that the open and obvious doctrine is inapplicable to children under the age of seven and that children under the age of seven cannot be expected to conform their conduct to a reasonable child standard. In other words, while *Bragan*, 263 Mich App at 335, applied a reasonable child standard to children over seven, this was consistent with long-established caselaw holding that a child over seven is expected to conduct himself "as a child of his age, ability, intelligence and experience would reasonably have been expected to do under like circumstances." *Burhans*, 375 Mich at 255. The open and obvious doctrine is premised on the proposition that it is "reasonable to expect" the invitee to discover the danger, *Hoffner*, 492 Mich at 461, and given the capabilities of children over seven, it can be reasonably expected that children over seven will conform their conduct to a reasonable child standard. In contrast, "the incapacity and irresponsibility" of children under the age of seven have longed been recognized, *Queen Ins Co*, 374 Mich at 658, and in view of this incapacity, there can be no reasonably careful minor standard for children under seven, see *Baker*, 374 Mich at 498, 505.

Consequently, in the context of the open and obvious doctrine, it is not reasonable to expect that a child under seven will conform to a reasonable child standard in discovering dangers, appreciating the danger involved, and responding to those dangers. Rather, the law presumes that a child under seven will not appreciate the danger, and thus the landowner remains obligated to exercise reasonable care to protect a child under seven from open and obvious dangers on the property, even if those dangers would be open and obvious to adults and older children. This rule is consistent with a landowner's obligation to exercise greater care for minors, *Bragan*, 263 Mich App at 330; and it safeguards children by placing the burden on landowners to protect child-invitees under seven from open and obvious dangers on the property owner as opposed to expecting small children to protect themselves.[18] See generally *Woodman*, 486 Mich at 257 & n 60. Although the imposition of a brightline rule may seem arbitrary in some cases,[19] the age of seven is the long-established "dividing line" in Michigan. Adhering to this dividing line, we adopt a brightline rule that landowners cannot reasonably expect children under seven to recognize a dangerous condition, to appreciate the danger, and to exercise any degree of reasonable care in response to that condition.

Given our conclusion that the open and obvious doctrine does not apply to children under seven, it is inapplicable to Ezekiel, who was six-years-old at the time of the accident. Consequently, the trial court did not err by concluding that the open and obvious doctrine did not apply to Ezekiel. Defendant is not entitled to relief on this basis.

---

[18] This is not to say that a child's conduct is irrelevant at trial. A child's conduct may be admissible as it relates to the question of whether a defendant breached a duty to a child. See *Baker*, 374 Mich at 505. We simply hold that the incapability and irresponsibility of children under seven precludes the conclusion that an adult landowner has no duty to protect a tender years invitee from an open and obvious danger.

[19] For instance, in this case, Ezekiel was only two days shy of his seventh birthday at the time of the accident.

## IV.  CAMPGROUND REGULATIONS

Defendant argues that the trial court erred by instructing the jury under M Civ JI 12.05 with regard to defendant's alleged violation of Mich Admin Code R 326.1556(8) and Mich Admin Code R 326.1558(1).  According to defendant, these rules are irrelevant to this case and any violation could not be considered a proximate cause of the accident.  We agree that the trial court erred by instructing the jury under M Civ JI 12.05 with regard to the number of campsites; however, we conclude that the trial court did not abuse its discretion in concluding that M Civ JI 12.05 was applicable with regard to the size of the service drive.

"In Michigan, the violation of administrative rules and regulations is evidence of negligence, and therefore when a violation is properly pled it may be submitted to the jury." *Zalut v Andersen & Assoc, Inc*, 186 Mich App 229, 235; 463 NW2d 236 (1990).  See also *Kennedy v Great Atl & Pac Tea Co*, 274 Mich App 710, 720; 737 NW2d 179 (2007) (applying this rule in a premises liability case).  Specifically, an instruction regarding violations of regulations as evidence of negligence is set forth in M Civ JI 12.05, which states:

> The [ *name of state agency*] in Michigan has adopted certain regulations pursuant to authority given to it by a state statute. [ Rule / Rules ] _____ of [ *name of state agency* ] [ provides / provide ] that [ *here quote or paraphrase applicable parts of regulation(s) as construed by the courts* ].

> If you find that defendant violated [ this regulation / one or more of these regulations ] before or at the time of the occurrence, such [ violation / violations ] [ is / are ] evidence of negligence which you should consider, together with all the other evidence, in deciding whether defendant was negligent. If you find that defendant was negligent, you must then decide whether such negligence was a proximate cause of the [ injury / damage ] to plaintiff.

This instruction should only be given if:  (1) the regulation is intended to protect against the injury involved; (2) the plaintiff is within the class intended to be protected by the regulation; and (3) the evidence will support a finding that the violation was a proximate cause of the injury involved.  M Civ JI 12.03, use notes; M Civ JI 12.05, use notes.  "These factors are necessary to a determination of relevance." *Klanseck v Anderson Sales & Serv, Inc*, 426 Mich 78, 87; 393 NW2d 356 (1986).[20]  That is, "[w]hen a party is alleged to have violated [a regulation], the court may apply the factors above in assessing whether the claimed violation is relevant to the facts presented at trial." *Id*.  "[R]elevance must be specifically established" before evidence of a violation may be used as evidence of negligence. *Id*.  See also *Zalut*, 186 Mich App at 235.

In this case, the two regulations at issue are rules created by the Department of Environmental Quality (DEQ) under its authority to "promulgate rules regarding sanitation and safety standards for campgrounds and public health."  MCL 333.12511.  First, under Mich

---

[20] *Klanseck* involved a violation of a statute, but the factors for assessing the relevance of a statutory violation are the same as those for violation of a regulation.

Admin Code R 326.1556(8), "[a] campground owner shall ensure that the number of sites in a campground is not more than the number authorized by the license." Regarding defendant's compliance with this regulation, the evidence at trial indicated that there were 399 sites on the campgrounds and that defendant only had a license for 133 campsites. Fair organizers maintained that they had a "temporary" permit for 399 campsites during the fair and there was evidence that defendant was approved for 399 sites on August 31, 2012. However, a jury could certainly reject defendant's claim of an undocumented "temporary" license and conclude that defendant was in violation of Mich Admin Code R 326.1556(8) at the time of the accident because defendant had more campsites than allowed by its license.

Nevertheless, this violation of Mich Admin Code R 326.1556(8) is not relevant and the jury should not have been allowed to consider it. In particular, in the trial court, plaintiff maintained that the excessive number of campsites was relevant because it suggested congestion or overcrowding that would have increased both vehicular and bike traffic. But, first of all, the regulation says nothing about traffic and it cannot reasonably be supposed that this licensing requirement is designed to prevent traffic accidents. Second, plaintiff's assertion that there were too many people for the campground to handle safely is belied by the fact that defendant was approved for 399 campsites shortly after the accident. In other words, defendant may have violated the regulation by failing to obtain a license for 399 sites before the fair; but, the approval shortly after the fair makes plain that it was not an issue of insufficient space or overcrowding that prevented defendant from obtaining a license. Third, and perhaps most importantly, there is no evidence that this purported overcrowding contributed to—let alone proximately caused—Ezekiel's death. Ezekiel was killed in an accident between a single vehicle and a single bike rider. There was no evidence that the service drive was overly crowded with pedestrians, bikes or moving vehicles at the time of the accident, and there is no evidence that overcrowding contributed to the accident. Quite simply, the license issue was irrelevant and the jury should not have been allowed to consider the issue. Thus, the trial court erred by instructing the jury under M Civ JI 12.05 with regard to Mich Admin Code R 326.1556(8).[21]

The second regulation at issue is Mich Admin Code R 326.1558(1), which states:

---

[21] Although the trial court erred, reversal is not required on this basis. M Civ JI 12.05 does not render defendant negligent as a matter of law; rather it simply allowed the jury to consider a violation of the regulation as evidence of negligence. Even if the jury determined that defendant was in violation of Mich Admin Code R 326.1556(8) on August 8, 2012, it is unlikely such a determination would have affected the outcome of trial. The issue of the number of licensed campsites was a relatively minor issue at trial, and given the weighty issues involved, it seems improbable that a jury would have held defendant liable for the death of child because defendant had too many campsites, particularly when the evidence plainly demonstrated that defendant had the space for those campsites. See *Jimkoski v Shupe*, 282 Mich App 1, 9; 763 NW2d 1 (2008) ("Reversal is not warranted when an instructional error does not affect the outcome of the trial.").

A campground owner shall provide a road right-of-way that is not less than 20 feet wide. A campground owner shall ensure that the right-of-way is free of obstructions and provides free and easy access to abutting sites. A campground owner shall maintain the traveled portion of the right-of-way in a passable and relatively dust-free condition when the campground is in operation.

Regarding defendant's compliance with this rule, measurements of the service drive indicated that it was 13.5 feet wide, and thus the jury could conclude that defendant violated its obligation to maintain a "road right-of-way that is not less than 20 feet wide."[22] Whether this potential violation was relevant is a close question. In terms of the injury the regulation was designed to protect against, the regulation focuses mainly on providing access to campsites, but the size requirements for the road, the "free and easy" access, the passable road requirements, and even the "dust-free" caveats can be read as an indication that the regulation is intended to ensure safe road access to the campsites and safe travel while on the road. It is true that nothing in the regulation mentions bikes in particular, and certainly the regulations do not require defendant to maintain a separate bike path. But, it could nevertheless be concluded that the regulation was intended to guard against accidents resulting from insufficient space for a motor vehicle to maneuver while on the campgrounds. Ezekiel, as a camper using the road to travel to and from his campsite, would be within the class of people the road was designed to protect.

The real issue is whether the size of the road can be considered a proximate cause of plaintiff's injuries. Although the question is a close one, the trial court did not abuse its discretion by allowing the jury to consider the issue. The claim in this premises liability case is that a proximate cause of Ezekiel's injuries was defendant's alleged failure to protect Ezekiel from the unreasonable risks of harm posed by a dangerous condition on defendant's land— namely, a mixed use roadway on which vehicles, bikes, and pedestrians were allowed to travel. See *Hoffner*, 492 Mich at 460. In this context, though only one of many potential factors, the size of the service drive, and defendant's failure to abide by Mich Admin Code R 326.1558(1), could be significant to a determination of whether the service drive was unreasonably dangerous and whether defendant's failure to protect Ezekiel from this unreasonable danger constituted a proximate cause of his injuries. In other words, defendant's decision to allow mixed-use access of the road is a "but-for" cause of Ezekiel's death, and the size of the road is a significant factor bearing on the reasonableness of defendant's decision and the foreseeability of the consequences of defendant's decision for purposes of determining whether defendant may be held legally

---

[22] The evidence indicated that the "gravel" portion of the road was 13.5 feet wide. There was a witness who claimed that the "right-of-way" was actually 16 or 20 feet and that the travelled portion of the road was smaller than the right-of-way because grass had grown in on some of the gravel. Defendant emphasizes this distinction on appeal and asserts that, while the right-of-way must be 20-feet wide, the travelled portion may be smaller because it is only the "traveled portion" that must be "passable and relatively dust-free" under Mich Admin Code R 326.1558(1). Even assuming that the travelled portion can be smaller than 20-feet wide, a 16-foot right-of-way would not comply with the regulation. See Mich Admin Code R 326.1558(1). Thus, a jury could find that defendant violated this provision.

responsible. See generally *Haliw*, 464 Mich at 310. On the whole, the trial court did not abuse its discretion in instructing the jury under M Civ JI 12.05 with regard to Mich Admin Code R 326.1558(1).

## V. TAXABLE COSTS AND PREJUDGMENT INTEREST

Finally, defendant argues, and plaintiff concedes, that if the underlying judgment is vacated, the award of costs and prejudgment interest in plaintiff's favor should also be vacated. We agree. That is, having vacated the underlying judgment, it follows that plaintiff is no longer a "prevailing party," and thus plaintiff is not entitled to costs under MCR 2.625. See *Ivezaj v Auto Club*, 275 Mich App 349, 368; 737 NW2d 807 (2007). Likewise, absent a "judgment" in plaintiff's favor, there is no basis for awarding plaintiff pre-judgment interest as the prevailing party under MCL 600.6013(8). See generally *Estate of Hunt by Hunt v Drielick*, ___ Mich App ___, ___; ___ NW2d ___ (2017) (Docket No. 333630), slip op at 11 ("MCL 600.6013 is remedial and primarily intended to compensate prevailing parties for expenses incurred in bringing suits for money damages and for any delay in receiving those damages."). Consequently, we also vacate the award of costs and prejudgment interest.

Vacated and remanded for a new trial. We do not retain jurisdiction.

/s/ Christopher M. Murray
/s/ Joel P. Hoekstra
/s/ Michael F Gadola

-22-