*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

---

DARRYL L. LAWRENCE, Individually and as
Personal Representative of the ESTATE OF
KRYSTAL GAYLE LAWRENCE,

        Plaintiff-Appellant,

v

SARAH ELIZABETH SCHAUF, AUSTIN
PATRICK MARTIN, HARRY ALAN MARTIN,
FREMONT INSURANCE COMPANY, and
PROGRESSIVE MARATHON INSURANCE
COMPANY,

        Defendants-Appellees,

and

LYFT, INC., and MICHIGAN AUTOMOBILE
INSURANCE PLACEMENT FACILITY,

        Defendants.

UNPUBLISHED
February 10, 2022

No. 354872
Kalamazoo Circuit Court
LC No. 19-000145-NI

---

Before: BORRELLO, P.J., and M. J. KELLY and REDFORD, JJ.

PER CURIAM.

Plaintiff Darryl Lawrence, individually and as personal representative of the Estate of Krystal Gayle Lawrence, appeals as of right the trial court's stipulated final order of dismissal and previously entered orders granting summary disposition in favor of defendants Austin Martin, Harry Martin, Sarah Schauf, Fremont Insurance Company (Fremont), and Progressive Marathon Insurance Company (Progressive). We affirm.

## I. FACTUAL BACKGROUND

This case arises from an automobile accident that occurred on the dark, rainy night of October 12, 2018, shortly after 10:00 p.m., in which separate cars driven by defendants Austin Martin and Sarah Schauf struck Krystal Lawrence, a darkly clothed pedestrian, with a blood alcohol level of 0.296[1], as she attempted to cross West Michigan Avenue, a five-lane street, in Kalamazoo, Michigan. The decedent made a purchase at a convenience store and decided to cross the street without using a crosswalk. She made it through the two westbound lanes, the center turn lane, and one eastbound lane, before being struck by Austin's car as she entered the outside curb lane. The collision knocked Lawrence into the adjacent eastbound lane where she fell to the ground and Schauf's vehicle ran over her. Lawrence was pronounced deceased at the scene.

Plaintiff's complaint alleged claims for negligence against Austin, Harry Martin,[2] and Schauf. Plaintiff also sought first-party personal protection insurance ("PIP") benefits, including survivor benefits, from the Martin's automobile insurer, Fremont, and from Schauf's insurer, Progressive. All defendants moved for summary disposition. The trial court held that, under MCL 600.2955a, the Martin defendants and Schauf were entitled to summary disposition because no reasonable jury could find that Lawrence was less than 50% at fault for the accident. The court also granted summary disposition in favor of Fremont and Progressive, ruling that plaintiff failed to demonstrate that Lawrence provided regular financial support for her daughter, JL, and therefore, JL lacked eligibility to recover survivor benefits under MCL 500.3108(1).

## II. STANDARD OF REVIEW

We review de novo a trial court's decision on a motion for summary disposition. *Coblentz v City of Novi*, 475 Mich 558, 567; 719 NW2d 73 (2006). The trial court granted summary disposition under MCR 2.116(C)(10). In reviewing a motion under this subrule, a court must consider the substantively admissible evidence submitted by the parties and must review such evidence and all legitimate inferences in the light most favorable to the nonmoving party. *Id.* at 567-568. The court must determine whether the proffered evidence fails to establish a genuine issue regarding any material fact and the moving party is entitled to judgment as a matter of law. *Id.*; *Maiden v Rozwood*, 461 Mich 109, 120; 597 NW2d 817 (1999). Issues of statutory interpretation present questions of law, subject to review de novo. *Estate of Goodwin v Northwest Mich Fair Ass'n*, 325 Mich App 129, 138; 923 NW2d 894 (2018).

## III. ANALYSIS

### A. SUMMARY DISPOSITION FOR MARTIN DEFENDANTS

Plaintiff first argues that the trial court erred by granting summary disposition in favor of the Martin defendants on the ground that no reasonable juror could find that Lawrence was less

---

[1] After her death, toxicology testing revealed that at the time she attempted to cross West Michigan Avenue, Lawrence had a blood alcohol level of 0.296 per 100 milliliters of blood, more than three times the limit of 0.08 for drunk driving.

[2] Defendant Harry Martin owned the vehicle driven by Austin.

than 50% at fault for the accident, and therefore, MCL 600.2955a(1) barred plaintiff's claim. We disagree.

To prove negligence, a plaintiff must prove that (1) the defendant owed the plaintiff a duty of care, (2) the defendant breached that duty, (3) the plaintiff was injured, and (4) the defendant's breach caused the plaintiff's injury. *Henry v Dow Chem Co*, 473 Mich 63, 71-72; 701 NW2d 684 (2005). Causation in a negligence action requires proof of both cause in fact and proximate cause. *Reeves v Kmart Corp*, 229 Mich App 466, 479; 582 NW2d 841 (1998).

A motor vehicle operator owes a duty to pedestrians to exercise due care. *Sweet v Ringwelski*, 362 Mich 138, 148; 106 NW2d 742 (1961); *Poe v Detroit*, 179 Mich App 564, 571; 446 NW2d 523 (1989). By the same token, however, a pedestrian "must take such care for his own safety as a reasonable, careful, prudent person would do under similar circumstances." *Malone v Vining*, 313 Mich 315, 321; 21 NW2d 144 (1946) (quotation marks and citation omitted). "In the absence of evidence to the contrary, a pedestrian killed while walking on a public highway is presumed to have exercised at all times the requisite degree and amount of care for his own safety and preservation." *People v Campbell*, 237 Mich 424, 442; 212 NW 97 (1927) (citation omitted). However, a pedestrian who knows that a vehicle is oncoming has a duty to watch the vehicle's progress to avoid being hit. *Heger v Meissner*, 340 Mich 586, 589; 66 NW2d 220 (1954). In *Malone*, our Supreme Court explained:

> Under present-day traffic conditions a pedestrian, before crossing a street or highway, must (1) make proper observation as to approaching traffic, (2) observe approaching traffic and form a judgment as to its distance away and its speed, (3) continue his observations while crossing the street or highway, and (4) exercise that degree of care and caution which an ordinarily careful and prudent person would exercise under like circumstances. . . .
>
> Pedestrians upon the public highway have a right to assume in the first instance the driver of an automobile will use ordinary care and caution for the protection of pedestrians, nevertheless the pedestrian must not rest content on such assumption, if there comes a time where he knows, or ought to know by the exercise of reasonable care, he is being placed in danger. He must take such care for his own safety as a reasonable, careful, prudent person would do under similar circumstances.
>
> We have repeatedly held that one must look before entering a place of possible danger, such as crossing an intersection, and maintain observation while crossing.
>
> If one is to make a proper observation of an oncoming car, []the observation must include not only the distance the approaching car is from the point of possible collision but also some observation and judgment of its approximate speed.
>
> In many cases we have held that one is not free from contributory negligence who observes an automobile coming on the intersecting street and then proceeds to cross without giving further heed to the oncoming vehicle until the

instant before or at the time of collision. [*Malone*, 313 Mich at 321-322 (quotation marks and citations omitted).]

Moreover, a trial court should consider whether a pedestrian crossed outside a crosswalk, because that can be evidence of comparative negligence. *Mason v Wayne Co Bd of Comm'rs*, 447 Mich 130, 136 n 5; 523 NW2d 791 (1994) ("Pedestrians crossing outside of crosswalks face the additional hurdle of comparative negligence.")

Whether a driver was negligent is generally a question of fact for the jury. See *Cole v Barber*, 353 Mich 427, 431; 91 NW2d 848 (1958). However, MCL 600.2955a provides:

> (1) It is an absolute defense in an action for the death of an individual or for injury to a person or property that the individual upon whose death or injury the action is based had an impaired ability to function due to the influence of intoxicating liquor or a controlled substance, and as a result of that impaired ability, the individual was 50% or more the cause of the accident or event that resulted in the death or injury. If the individual described in this subsection was less than 50% the cause of the accident or event, an award of damages shall be reduced by that percentage.

> (2) As used in this section:

> (a) "Controlled substance" means that term as defined in section 7104 of the public health code, Act No. 368 of the Public Acts of 1978, being section 333.7104 of the Michigan Compiled Laws.

> (b) "Impaired ability to function due to the influence of intoxicating liquor or a controlled substance" means that, as a result of an individual drinking, ingesting, smoking, or otherwise consuming intoxicating liquor or a controlled substance, the individual's senses are impaired to the point that the ability to react is diminished from what it would be had the individual not consumed liquor or a controlled substance. An individual is presumed under this section to have an impaired ability to function due to the influence of intoxicating liquor or a controlled substance if, under a standard prescribed by section 625a of the Michigan vehicle code, Act No. 300 of the Public Acts of 1949, being section 257.625a of the Michigan Compiled Laws, a presumption would arise that the individual's ability to operate a vehicle was impaired.

At the time of the accident that caused Lawrence's death, MCL 257.625a(7)(b) set the relevant legal alcohol intoxication limit as 0.08 grams or more per 100 milliliters of blood, per 210 liters of breath, or per 67 milliliters of urine. The uncontroverted evidence established that toxicology test results following Lawrence's death reported that she had a blood alcohol level of 0.296 per 100 milliliters of blood, more than three times the legal limit. Indeed, plaintiff concedes in his brief that Lawrence's blood alcohol level "raises a presumption of her impairment." The Martin defendants were entitled to summary disposition if no reasonable person could find that Lawrence, who was presumptively impaired because of her high blood alcohol content, was 50% or more the cause of the accident or event that resulted in her death.

This case also raises the issue whether any evidence supported a conclusion that Austin Martin violated MCL 257.627, which provides in pertinent part:

(1) A person operating a vehicle on a highway shall operate that vehicle at a careful and prudent speed not greater than nor less than is reasonable and proper, having due regard to the traffic, surface, and width of the highway and of any other condition existing at the time. A person shall not operate a vehicle upon a highway at a speed greater than that which will permit a stop within the assured, clear distance ahead. A violation of this subsection shall be known and may be referred to as a violation of the basic speed law or "VBSL".

(2) Except as provided in subsection (1), it is lawful for the operator of a vehicle to operate that vehicle on a highway at a speed not exceeding the following:

* * *

(h) 35 miles per hour on a highway segment with not less than 45 vehicular access points but no more than 49 vehicular access points within ½ mile.

Plaintiff maintains that evidence was presented that Austin violated Subsection (2)(h) by his admission that he believed that he drove 38 miles per hour in the 35 mile per hour zone located at the scene of the accident. Plaintiff also argues that Austin violated the basic speed law by failing to operate his car at a prudent speed or to keep a proper lookout for Lawrence. Plaintiff appears to also acknowledge, however, that Lawrence violated portions of the Kalamazoo City Traffic Code by jaywalking. Article X of the Kalamazoo City Traffic Code governs pedestrian conduct, and § 36-282(A) states that "[n]o pedestrian shall cross or enter a public street in the City in a manner which endangers or is likely to endanger such pedestrian or others lawfully using the street." Further, § 36-280(D) of the Traffic Code provides in part that "[e]very pedestrian or bicyclist crossing the roadway at any point other than within a marked crosswalk or within an unmarked crosswalk at an intersection shall yield the right of way to oncoming vehicles upon the roadway." "In Michigan, a violation of a statute creates a rebuttable presumption of negligence while the violation of an ordinance or administrative regulation constitutes evidence of negligence." *Candelaria v BC Gen Contractors, Inc*, 236 Mich App 67, 82 n 5; 600 NW2d 348 (1999).

The undisputed record evidence established that Lawrence, while wearing dark clothing and legally intoxicated attempted to cross the street where no crosswalk existed, and ventured into the eastbound lanes which had oncoming traffic. Both drivers, Austin and Schauf, were unaware of her presence until too late. The undisputed evidence supported the trial court's decision. In any event, a jury may not award damages in favor of a party who is more than fifty percent at fault. MCL 500.3135(2)(b).

1. USE OF "*WHAT EVERY DRIVER MUST KNOW*" PAMPHLET

Plaintiff seeks to rely on various statements in a pamphlet issued by the Michigan Secretary of State, entitled *What Every Driver Must Know*, as authority for determining Austin's duties toward Lawrence. Plaintiff's reliance on this pamphlet as authority regarding the parties' respective duties, for example, to determine whether Lawrence or Austin had the right-of-way, is

misplaced. The pamphlet is not an official source of Michigan's constitutional, statutory, or common law. Rather, as explained in the preface to the 2016 edition issued by former Secretary of State Ruth Johnson, it is merely a guide to finding information regarding "obtaining a driver's license, common traffic laws, signs and signals, and basic driving tips for sharing the road and handling emergency situations." Michigan Secretary of State, *What Every Driver Must Know* (April 2016), preface. Similarly, current Secretary of State Jocelyn Benson's preface to the 2019 edition cited by plaintiff discusses the pamphlet as "an excellent resource for assisting [drivers] on this lifelong journey." Michigan Secretary of State, *What Every Driver Must Know* (September 2019), preface. Historically, our Supreme Court has only endorsed the use of stopping-distance tables in the pamphlet, which are no longer contained in the pamphlet. See *Winekoff v Pospisil*, 384 Mich 260, 268-269; 181 NW2d 897 (1970) (permitting judicial notice of the "Stopping Distance-Passenger Cars" chart, with the caveat that "intervening changes of design or construction, say of cars, tires, or pavement surfaces, have rendered the chart misleading" would be a "good" objection to its introduction). Contrary to plaintiff's assertion, the pamphlet is not authoritative for determining the relative rights and responsibilities of the parties in this case.

## 2. CRASH REPORT

Plaintiff also relies on a report prepared by plaintiff's accident-reconstruction expert Timothy Robbins's conclusion that "the lighting would have sufficiently illuminated Ms. Lawrence as she crossed the five lanes of W. Michigan Avenue," which he based in part on photographs of the street that he included in his report. Plaintiff also relies on Robbins's estimation of Lawrence's speed as she crossed the street, and the amount of time this would have given Austin to see Lawrence before he struck her.

Much of Robbins's report, however, is inadmissible or insufficient to establish a question of fact. A witness qualified as an expert may testify in the form of an opinion or otherwise if "(1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." MRE 702. There must be evidentiary support for any facts or data on which an expert bases an opinion. MRE 703 ("The facts or data in the particular case upon which an expert bases an opinion or inference shall be in evidence."). In *Craig v Oakwood Hosp*, 471 Mich 67, 82; 684 NW2d 296 (2004), our Supreme Court stated:

> Under MRE 702, the trial court had an independent obligation to review *all* expert opinion testimony in order to ensure that the opinion testimony . . . was rendered by a "qualified expert," that the testimony would "assist the trier of fact," and . . . that the opinion testimony was rooted in "recognized" scientific or technical principles. These obligations applied irrespective of the type of expert opinion testimony offered by the parties. While a party may waive any claim of error by failing to call this gatekeeping obligation to the court's attention, the court *must* evaluate expert testimony under MRE 702 once that issue is raised. [Emphasis in original.]

In addition, MCL 600.2955 provides, in pertinent part:

(1)  In an action for the death of a person or for injury to a person or property, a scientific opinion rendered by an otherwise qualified expert is not admissible unless the court determines that the opinion is reliable and will assist the trier of fact.  In making that determination, the court shall examine the opinion and the basis for the opinion, which basis includes the facts, technique, methodology, and reasoning relied on by the expert, and shall consider all of the following factors:

(a)  Whether the opinion and its basis have been subjected to scientific testing and replication.

(b)  Whether the opinion and its basis have been subjected to peer review publication.

(c)   The existence and maintenance of generally accepted standards governing the application and interpretation of a methodology or technique and whether the opinion and its basis are consistent with those standards.

(d)  The known or potential error rate of the opinion and its basis.

(e)  The degree to which the opinion and its basis are generally accepted within the relevant expert community.  As used in this subdivision, "relevant expert community" means individuals who are knowledgeable in the field of study and are gainfully employed applying that knowledge on the free market.

(f)  Whether the basis for the opinion is reliable and whether experts in that field would rely on the same basis to reach the type of opinion being proffered.

(g)  Whether the opinion or methodology is relied upon by experts outside of the context of litigation.

When expert testimony is offered in opposition to a motion for summary disposition, a court must evaluate that testimony.  As explained in *Amorello v Monsanto Corp*, 186 Mich App 324, 331-332; 463 NW2d 487, 491 (1990):

Summary disposition is not precluded simply because a party has produced an expert to support its position.  The expert's opinion must be admissible.  MRE 403; MRE 702.  For an expert's opinion to be admissible, the court must determine whether the opinion will assist the trier of fact to understand the evidence or to determine a fact in issue, and the opinion must not tend to mislead or confuse the jury.  *Id*.  The facts and data upon which the expert relies in formulating an opinion must be reliable.  [Citations omitted.]

"An expert witness's opinion is objectionable if it is based on assumptions that do not accord with the established facts," and when it is based on assumptions "that are contrary to the facts in evidence, it is technically irrelevant to the actual issues at trial."  *People v Unger*, 278 Mich App 210, 248; 749 NW2d 272 (2008).  Moreover, unsupported conclusory statements cannot establish a genuine issue of material fact that satisfies the party opposing a summary disposition motion's

burden. See *Rose v Nat'l Auction Group, Inc*, 466 Mich 453, 470; 646 NW2d 455 (2002) (explaining that it "is not enough to create a genuine issue of material fact to provide conclusory statements that a duty was breached."); *Quinto v Cross & Peters Co*, 451 Mich 358, 371-372; 547 NW2d 314 (1996) (holding insufficient an affidavit that provided "mere conclusory allegations and was devoid of detail" to avoid summary disposition under MCR 2.116(C)(10)); see also *Jubenville v West End Cartage, Inc*, 163 Mich App 199, 207; 413 NW2d 705 (1987) (conclusory assertions that are unsupported and based on mere speculation are insufficient to establish a question of fact).

In this case, Robbins's report contains a number of conclusions that rely on facts or data created by Robbins, but unsupported by any evidence of the incident itself. As an example, plaintiff offers Robbins's report as evidence that Austin would have experienced lighting conditions at the time of the accident on October 12, 2018, shortly after 10:00 p.m. According to witnesses, however, it was raining and dark that night. Robbins's report states that he visited the accident scene on April 7, 2020, at approximately 10:30 p.m., when the area was wet and the skies were overcast. However, Robbins did not photograph the scene during rain, a factor that would affect visibility, as on the night of the accident. Moreover, Robbins specifically states that the photographs "are to help show the illumination pattern of the streetlights but are not intended to show what the human eye can see." Robbins presented another photograph that he took to demonstrate "how easily a pedestrian in dark clothing can be seen." The photograph is of a street in which a pedestrian can be seen, but the photograph is blurry and appears to have either been taken using magnification or from a much closer vantage point than the first picture. The items Robbins relied on to fashion his opinions did not replicate the actual accident conditions that record evidence established.

When asked to describe the lighting, Austin stated that it was poor, with the streetlights "very spaced out" with some light bulbs missing in the area. Kalamazoo Public Safety Officer Ariana Gasca, who attended the scene shortly after the accident, similarly testified that it was already night and she did not think there were too many streetlamps on or maybe they were just too far apart. She also testified that when she arrived at the scene, she "barely even saw [Lawrence] in the road because there was so much reflection from the lights . . . from the cars that were stopped, the road was wet."

Robbins's photographs were taken 1½ years later, under different weather conditions and without any other visible traffic. Robbins essentially created his own data, which he then used to justify his speculative opinion. To the extent that Robbins relied on the photographs to demonstrate that Lawrence would have been visible as she crossed the street, such reliance was misplaced because it failed to account for and could not rebut uncontroverted established facts. Moreover, because Robbins conceded that the photographs were not intended to show what the human eye could see, they could not establish a question of fact whether Austin could or should have seen Lawrence in time to avoid hitting her when she ventured into his car's path.

In determining that Austin would have been able to see Lawrence as she crossed the other lanes of traffic, Robbins estimated that it would have taken five seconds for Lawrence to walk the 30 feet to the center lane if she walked at six feet per second, which he asserts is an above-average walking speed. Robbins based his assumptions about Lawrence's walking speeds, however, solely on speculation, unsupported by any facts in evidence. Further, even assuming that data could lend

support to Robbins's assumptions, Robbins did not discuss how seeing Lawrence for five seconds before the accident would have permitted Austin to stop before hitting Lawrence. As defendants point out, Robbins did not opine that Austin's speed served as a factor in the accident.

Robbins's opinions also appear to have been based in part on various "duties" derived from the "*What Every Driver Must Know*" publication. As explained earlier, the handbook is not an authoritative basis for determining the parties' relative rights and responsibilities. Moreover, the handbook is not probative of the issue of Lawrence's comparative negligence, i.e., whether Lawrence was more than 50% at fault.

The record reflects that plaintiff failed and could not show that Robbins's opinions were based on facts or data supported by evidence. His opinions did not account for established facts such as the actual weather or other conditions at the time of the accident. Robbins's opinions were not the product of reliable principles and methods, nor did he reliably apply scientific principles to the actual facts of the case. Accordingly, Robbins's opinions did not satisfy the requirements set forth in MRE 702 or MCL 600.2955. Therefore, as a matter of law, Robbins's report and speculative opinions failed and could not establish a question of fact concerning whether Austin negligently operated his vehicle.

### 3. APPLICATION OF MCL 600.2955a

"[P]ursuant to MCL 600.2955a, in order to successfully avail itself of the absolute defense of impairment, defendant in this case was required to establish that (1) the decedent had an impaired ability to function due to the influence of intoxicating liquor or a controlled substance, and (2) that as a result of that impaired ability, the decedent was fifty percent or more the cause of the accident or event that resulted in his death." *Harbour v Correctional Med Servs, Inc*, 266 Mich App 452, 456; 702 NW2d 671 (2005). Plaintiff argues that although Lawrence's 0.296 blood alcohol content raised a presumption of impairment under MCL 600.2955a(2)(b), that presumption is rebuttable. In an effort to rebut the presumption, plaintiff admits that Lawrence had a history of substance abuse, but contends that "[i]t is commonly understood that persons with chronic histories of excessive alcohol use have higher tolerances than casual drinkers" and urges this Court to consider such anecdotal information applicable in this case to Lawrence and treat that as sufficient to establish the existence of a genuine issue of material fact. Even if such common understanding may be true, plaintiff presented no competent evidence to establish that Lawrence, despite her 0.296 blood alcohol content, was not impaired. Plaintiff did not provide any substantively admissible evidence to rebut the presumption of her impairment. Plaintiff proffered no evidence that Lawrence actually had a higher tolerance than an "average" person who consumes alcohol, nor any expert testimony or other explanation for how such a "common understanding" may be quantified into a workable framework for rebutting a presumption of impairment for a person with a blood alcohol content of 0.296. Thus, plaintiff's contention that, given Lawrence's history of substance abuse, a blood alcohol content of 0.296 would not have impaired her ability to function rests solely on mere speculation. Moreover, even if one were to agree that a person with such a high blood alcohol content theoretically might not be impaired, such would not alter the fact that Lawrence ventured out into a street on a dark rainy night into the path of oncoming traffic. Such conduct demonstrates serious impairment of decision-making ability. The trial court did not err by holding that plaintiff failed to establish a question of fact regarding Lawrence's ability to

function unimpaired despite her consumption of alcohol to the point of having a 0.296 blood alcohol content.

Plaintiff also argues that, even though Lawrence attempted to cross the street outside a crosswalk, she was not negligent because the nearest crosswalk was more than 600 feet away and no evidence established that Lawrence was even aware of that crosswalk. Plaintiff, however, presents no authority for the proposition that a pedestrian may be excused for jaywalking if she is unaware of a nearby crosswalk or decides that the nearest crosswalk is inconvenient. "A party may not simply announce a position and leave it to this Court to make the party's arguments and search for authority to support the party's position." *Seifeddine v Jaber*, 327 Mich App 514, 519-520; 934 NW2d 64 (2019). Lacking any legal authority for such contentions, we find plaintiff's argument meritless.

Plaintiff also relies on a statement in a police Incident/Investigation report which stated that a witness told a responding police officer that approximately 15 minutes before the accident, the witness observed a person who resembled Lawrence cross the street without difficulty. Because plaintiff relies on this out-of-court statement for the truth of the matter asserted, i.e., that the witness observed Lawrence crossing the street shortly before the accident, the statement is inadmissible hearsay absent an exception. MRE 401; MRE 402. As such, plaintiff must show that he could provide this evidence in admissible form at trial. When a document contains a second level of hearsay, each level must qualify under an exception to the hearsay rule. *Maiden*, 461 Mich at 125. The Incident/Investigation report itself is plausibly admissible under the business record exception, MRE 803(6). *Id*. at 124. However, plaintiff does not explain how the statement attributed to the witness falls within a recognized hearsay exception. "By presenting inadmissible hearsay evidence, a nonmoving party is actually promising to create an issue for trial where the promise is incapable of being fulfilled. The nonmovant is not showing that a genuine issue exists." *Id.* at 123 n 5.

Reviewing the evidence in the light most favorable to plaintiff, a reasonable jury could infer that Austin drove slightly over the speed limit in violation of MCL 257.627(2)(h), thereby creating a presumption of negligence. A reasonable jury could also rely on this information, coupled with the information that the roadway was dark and that it had been raining, to find that Austin violated a duty of care under MCL 257.627(1). However, plaintiff failed to present any substantively admissible evidence that Austin's speed caused or factored in the accident.

Plaintiff relies on Austin's acknowledgment to a detective that Austin may have seen Lawrence jogging across the street "at the last second" before the accident, and argues that this "direct contradiction" itself should have precluded the trial court from granting summary disposition. Viewed in a light most favorable to plaintiff, this statement indicates at most that Austin may have seen Lawrence just before striking her, but it provides no ground for concluding that Austin had the ability to see and react to Lawrence's unexpected presence. Plaintiff asserts that Austin's slightly different answers about his speed or whether he may have seen Lawrence at the last second before striking her suffices to establish a question of fact regarding the speed at which he traveled and whether he may have seen Lawrence early enough to react differently. Such speculation, however, does not suffice to establish a genuine issue of material fact for trial. Moreover, no evidence establishes that Austin acted in any manner other than a reasonably prudent driver under the circumstances.

Even if we were to conclude that some evidence indicated Austin's negligence, to avoid summary disposition, plaintiff had to establish a genuine issue of material fact regarding Lawrence's ability to function unimpaired by alcohol and that Lawrence was less than 50% at fault for the accident. If one infers from the evidence that Austin may have been partly at fault, the trial court did not err by concluding that any negligence by Austin paled in comparison to Lawrence's flagrant disregard for her own safety. The uncontroverted evidence established that, with a significantly high blood alcohol content, she attempted to cross a five-lane street outside of a crosswalk in dark clothing on a rainy dark night and ventured into the pathway of oncoming traffic. The trial court did not err by ruling that no reasonable jury could find Lawrence less than 50% at fault for the accident. Accordingly, we affirm the trial court's order granting summary disposition in favor of the Martin defendants.

## B. SUMMARY DISPOSITION FOR DEFENDANT SCHAUF

Plaintiff also argues that the trial court erred by granting defendant Schauf's motion for summary disposition. We again disagree.

As discussed earlier, plaintiff failed to establish a genuine issue of material fact regarding whether Lawrence was less than 50% at fault for the initial accident. The evidence also fails to establish a genuine issue of material fact whether Lawrence was less than 50% percent at fault regarding Schauf's role in the accident. Indeed, no evidence supports a finding that Schauf committed negligence when she struck Lawrence. The same underlying facts of darkness, rain, and the sudden appearance of a darkly clothed pedestrian crossing a five-lane street outside of a crosswalk apply equally when evaluating Schauf's conduct. Further, the evidence indicates that Schauf faced a completely unexpected emergency situation of a body landing in her vehicle's path without warning.

Plaintiff argues that the "[e]vidence presents the reasonable inference that Schauf exceeded the speed limit." Plaintiff misstates the evidence. Plaintiff contends that Schauf's testimony about her speed varied. He relies on the fact that Schauf testified that she drove "slightly under" or "slower" than the speed limit, but also claimed that she "was going with traffic." Plaintiff maintains that these statements establish inconsistencies that raise credibility issues which alone should preclude summary disposition. We disagree that these statements are inconsistent or present a question of fact precluding summary disposition. Schauf never testified that she drove over the speed limit, and her statement that she traveled at the speed of traffic cannot support an inference that she exceeded the speed limit, absent evidence that the vehicles she followed or with which she maintained pace exceeded the speed limit. No evidence in the record indicates such facts, and plaintiff does not identify any facts in evidence that permit such an inference. Instead, plaintiff seeks to rely on speculation.

Plaintiff states that Schauf traveled in the left lane of traffic, rather than the right lane as required under MCL 257.642(1)(a), and contends that "Schauf's presence in the left 'passing' lane raises a fact question that she was not driving below the speed limit, but was trying to 'overtake and pass' other vehicles." This argument again relies on speculation regarding the speed at which Schauf drove. Schauf's mere presence in a lane intended for passing does not establish that she exceeded the speed limit nor does it support an inference that she was speeding. Moreover, there are exceptions to the prohibition against traveling in the left lane, including when traffic exists in

both lanes, see MCL 257.634(2), and the evidence indicated that vehicles traveled in both travel lanes at the time of the accident. Such evidence demonstrates further Lawrence's impaired decision-making and negligent disregard for her own safety.

Plaintiff's argument that the evidence supports a finding that Schauf had to have seen Lawrence lying in the road lacks merit because he relies on the fact that another vehicle behind Austin's vehicle did not strike Lawrence after Austin hit her. Austin and the other driver both testified that they were driving in the curb lane, not the inner lane. The other vehicle could not have hit Lawrence because, after she stepped into Austin's lane, the impact of the collision threw her from the curb lane into the inner lane. It is speculative to assume that Schauf would have known that Lawrence lay in her traffic lane because other cars, not in her lane, swerved.

Robbins's report also does not support a finding that Schauf was negligent. First, Robbins relies in part on portions of "*What Every Driver Must Know*," which is not competent authority for determining comparative negligence. Further, although Robbins stated that Schauf's headlights appeared to be cloudy or oxidized, he admitted that he did not actually inspect Schauf's car. In any event, Robbins merely stated that oxidation "reduces the headlight projection and, thus, driver visibility from direct headlight illumination of objects on the roadway." He did not discuss how or to what extent headlight oxidation affects illumination compared to nonoxidized headlights, nor did he discuss whether the condition of Schauf's headlights rendered her vehicle noncompliant with MCL 257.699, which establishes illumination requirements for headlights. Specifically, MCL 257.699(b) and (c) provide:

> (b) There shall be an uppermost distribution of light, or composite beam, so aimed and of an intensity as to reveal persons and vehicles *at a distance of at least 350 feet ahead* for all conditions of loading.

> (c) There shall be a lowermost distribution of light, or composite beam, so aimed and of sufficient intensity to reveal persons and vehicles *at a distance of at least 100 feet ahead*; and under any condition of loading none of the high intensity portion of the beam shall be directed to strike the eyes of an approaching driver. [MCL 257.699 (emphasis added).[3]]

Robbins presented nothing to indicate that, on the evening of the accident, Schauf's headlights did not meet these requirements. He did not present any evidence regarding the standard low-beam illumination of headlights on a 2006 Prius, whether and to what extent such could have been affected by oxidation, or how any reduced illumination caused by oxidation would have affected the reaction time of a driver traveling 30 miles per hour, as Schauf testified. Robbins's observation that the headlights on Schauf's vehicle appeared to be cloudy or oxidized does not establish that Schauf's operation of the vehicle amounted to negligence. Further, Robbins never explained the extent to which oxidized headlights would have decreased Schauf's visibility and he never offered

---

[3] Plaintiff repeatedly asserts that Schauf's headlights were required to illuminate objects 500 feet away, citing MCL 257.684(a). However, this statute only states that one must use headlights if the natural light is insufficient to clearly illuminate objects 500 feet away. It is undisputed that Schauf's headlights were activated at the time Lawrence was struck.

an opinion whether any increased visibility from nonoxidized headlights would have enabled Schauf to see an object in the roadway in time to avoid hitting it. Robbins's report and opinions fail to create a genuine issue of material fact regarding Schauf's driving performance or whether the condition of her headlights served as a cause in fact of her striking Lawrence in the roadway.

Even if plaintiff could establish that Schauf's headlights affected her vision or her ability to stop before hitting Lawrence, such would not alter the conclusion that no reasonable juror could find under the circumstances of this case that Lawrence was less than 50% at fault. Accordingly, the trial court did not err by granting Schauf's motion for summary disposition.

## C. MOTION FOR RECONSIDERATION

Plaintiff next argues that the trial court erred by denying his motions for reconsideration of the orders granting summary disposition in favor of the Martin defendants and Schauf. We disagree.

"This Court reviews for an abuse of discretion a trial court's decision on a motion for reconsideration." *In re Estate of Moukalled*, 269 Mich App 708, 713; 714 NW2d 400 (2006). A trial court abuses its discretion when its decision is outside the range of reasonable and principled outcomes. *Jawad A Shah, MD, PC v State Farm Mut Auto Ins Co*, 324 Mich App 182, 208; 920 NW2d 148 (2018).

In support of her motions for reconsideration, plaintiff submitted still photographs taken from the convenience store video recording system shortly before the accident. The photographs depicted Lawrence entering the store and standing at the counter making purchases. Plaintiff argues that the photos show that Lawrence was not impaired while at the store shortly before she attempted to cross the street.

Motions for reconsideration are used to correct palpable error, not to present new evidence or arguments. *Maiden*, 461 Mich at 126 n 9. Evidence offered for the first time in support of a motion for reconsideration is "not properly before the court." *Id*.

The still photographs from the convenience store were available before the trial court decided the parties' motions for summary disposition. Plaintiff could have presented this evidence when responding to defendants' motions for summary disposition but did not. Regardless, the photographs fail to establish the trial court made a palpable error in granting the Martin defendants' and Schauf's motions for summary disposition. Although the photographs show Lawrence entering the convenience store and standing at the counter making purchases, they cannot establish whether Lawrence was impaired because the photos do not depict Lawrence's body movements, coordination at the time the photos were taken, or her mental function. Moreover, the photographs were cumulative of a detective's deposition testimony concerning whether Lawrence appeared intoxicated while she shopped in the store. The detective testified he reviewed the store security video from which the still photographs were obtained. The video lacked audio and the detective stated he could not see whether Lawrence's "eyes were glassy" and he did not recall whether Lawrence was "staggering." He acknowledged, however, nothing he could see at the time showed Lawrence was under the influence of alcohol. Because the still photographs were cumulative of this evidence which was before the court at the time it granted the Martin defendants' and Schauf's

motions for summary disposition, plaintiff failed to demonstrate the trial court made a palpable error when granting the motions. Further, determination of the degree of fault attributable to Lawrence did not rest solely on the issue of the degree of her impairment from ingestion of alcohol. The trial court could reasonably conclude from all of the other evidence that Lawrence bore 50% or more fault for the accident. Because no reasonable juror could find that plaintiff was less than 50% liable for the accident, the trial court properly granted defendants' motions for summary disposition. Accordingly, the trial court did not abuse its discretion when it denied plaintiff's motions for reconsideration.

## D. SURVIVOR BENEFITS

Plaintiff also argues that the trial court erred when it granted Progressive's and Fremont's motions for summary disposition respecting whether plaintiff was entitled to recover survivor or replacement service benefits under MCL 500.3108. We disagree.

"The [no-fault] act operates to compensate only a limited class of persons for economic losses sustained as a result of motor vehicle accidents." *Belcher v Aetna Cas & Surety Co*, 409 Mich 231, 243; 293 NW2d 594 (1980). Potential recipients of survivor's benefits must have had a certain relationship with the decedent before the decedent's death. *Id*. at 249. "Benefits for survivors' loss are payable only where the deceased had contributed things of tangible economic value to the dependent's support or where the deceased had performed services for his dependents during the injured person's lifetime." *Id*.

MCL 500.3108 governs benefits to survivors of individuals who die as a result of the ownership, operation, maintenance, or use of a motor vehicle. MCL 500.3108(1) provides in pertinent part:

> Except as provided in subsection (2), personal protection insurance benefits are payable for a survivor's loss which consists of a loss, after the date on which the deceased died, of contributions of tangible things of economic value, not including services, that dependents of the deceased at the time of the deceased's death would have received for support during their dependency from the deceased if the deceased had not suffered the accidental bodily injury causing death and expenses, not exceeding $20.00 per day, reasonably incurred by these dependents during their dependency and after the date on which the deceased died in obtaining ordinary and necessary services in lieu of those that the deceased would have performed for their benefit if the deceased had not suffered the injury causing death.

Under MCL 500.3108(1), only "dependents of the deceased at the time of the deceased's death" are entitled to survivor's benefits. Although MCL 500.3108 does not define "dependent," the term has been construed to include "a person who was receiving support and services from the deceased injured person prior to his death." *Belcher*, 409 Mich at 244. MCL 500.3110 provides further guidance as to who may qualify as a dependent of a decedent and states, in relevant part:

> (1) The following persons are conclusively presumed to be dependents of a deceased person:

\* \* \*

(c) A child while under the age of 18 years, or over that age but physically or mentally incapacitated from earning, *is dependent on the parent with whom he lives or from whom he receives support regularly at the time of the death of the parent*.

(2) In all other cases, questions of dependency and the extent of dependency shall be determined in accordance with the facts as they exist at the time of death. [Emphasis added.]

Plaintiff maintains that because Lawrence's daughter, JL, stayed with Lawrence on alternating weekends, she therefore "lived with" Lawrence, which is sufficient to trigger the conclusive presumption of MCL 500.3110(1)(c). We disagree.

In *Grange Ins Co of Mich v Lawrence*, 494 Mich 475; 835 NW2d 363 (2013), our Supreme Court addressed the application of the term "domiciled" in MCL 500.3114(1),[4] to determine priority for PIP benefits for minor children. In *Grange*, a consolidated case, the Court considered application of the law to two factual scenarios. In the first case, the parents of the child killed in an accident, Edward Lawrence and Laura Rosinski, divorced before the accident. The two shared joint legal custody, but Rosinski had "primary physical custody" of the decedent and her sister. *Id*. at 482. The child was killed while riding in a car driven by Rosinski. *Id*. The trial court determined that the child had two domiciles and that benefits should be paid equally by the parents' respective insurers. This Court affirmed that decision. *Id*. at 484. In the second case, the parents of the deceased minor child had also divorced before the accident. The divorce judgment granted both parents joint legal custody, but "physical custody" was awarded to the child's father, with the mother to have "reasonable visitation." *Id*. at 486. After the father decided to move to Tennessee, the custody order was modified to provide the mother with six weeks of vacation in the summer. *Id*. The child was killed in an accident when visiting her mother in Michigan for the summer. *Id*. 486-487. The trial court found that the child resided in Michigan when with her mother for the summer. *Id*. at 488. This Court reversed, "reasoning that the evidence of [the child's] domicile, and in particular her intent, presented a question of fact for resolution by the jury and that summary disposition was, thus, not proper for either party." *Id*. This Court rejected the argument that the judgment of divorce and the subsequent order modifying domicile conclusively established the child's domicile for all purposes. *Id*. at 489.

Our Supreme Court reasoned that the term "domicile" has "a particular meaning in the law" and that an individual can only have one domicile, which it defined as "[a] place where a person *lives* or has his home." *Id*. at 494 (emphasis added, citation omitted). The Court also noted that, when enacting the no-fault act, "rather than there being any indication that the Legislature intended to deviate from this common-law rule, there is, in fact, evidence that the Legislature favored this single-location rule." *Id*. at 495. The Court held that, unlike an adult, a child cannot acquire a "domicile of choice," and therefore, the traditional ways of determining a person's

---

[4] MCL 500.3114(1) provides that "a personal protection insurance policy described in section 3101(1)1 applies to accidental bodily injury to the person named in the policy, the person's spouse, and a relative of either domiciled in the same household, if the injury arises from a motor vehicle accident."

-15-

domicile are "irrelevant." *Id*. at 503. Instead, the Court "expressly recognized that a child's domicile, upon the divorce or separation of the child's parents, is the same as that of the parent to whose custody he has been legally given pursuant to a custody order." *Id*. at 504. The Court determined that this conclusion was also consistent with the Child Custody Act, MCL 722.21 *et seq*., which provides, *inter alia*, that courts are charged in any dispute regarding custody, with "declar[ing] the child's inherent rights and establish[ing] the rights and duties as to the child's custody . . . in accordance with this act." *Id*. at 506, quoting MCL 722.24(1). Our Supreme Court explained:

> Once a custody order is entered pursuant to a judgment of divorce *or otherwise*, that custody order is legally binding on the parents and the order cannot be modified absent court approval or compliance with the applicable provisions of the Child Custody Act. Because parents are legally bound by the terms of the custody order, the order therefore negates the parents' legal capacity, which is necessary to establish a domicile of choice for the minor child that is different from that established in the custody order." [*Id*. at 508-509 (emphasis added).]

Turning to the first case, the Court held that because Rosinski was awarded primary physical custody, the child's domicile was with her. *Id*. at 513. In the second case, the Court held that because the child's father had been awarded "physical custody," the child remained domiciled with him in Tennessee, despite her residence in Michigan at the time of the accident. *Id*. at 515.

Although MCL 500.3110 does not use the term "domicile," the phrase "dependent on *the parent with whom he lives*" (emphasis added) is synonymous with the longstanding definition of domicile, of which JL could have only one. In May 2018, Lawrence and JL's father, Timothy Engler, agreed that Engler would have sole physical custody of JL, with the two continuing to share legal custody, and the court entered an order awarding Engler sole physical custody of JL beginning June 15, 2018. Therefore, consistent with *Grange*, as a matter of law, JL did not "live with" Lawrence at the time of the accident, but with Engler.

Plaintiff also argues that Lawrence provided regular support for JL, thereby entitling JL to survivor's benefits under MCL 500.3110(1)(c). The May 21, 2018 custody order provided that "[c]hild support is still an issue and shall be referred to a hearing with the Referee." However, Engler testified that he did not ask for child support, and Lawrence did not pay any. Lawrence did not provide transportation for JL, and Engler testified that neither Lawrence nor her mother owned a vehicle. Although JL stayed with Lawrence during alternate weeks in the summer of 2018, Engler testified that Lawrence lived with her mother. Engler was not aware whether Lawrence paid her mother rent. Engler provided somewhat inconsistent answers concerning any other support. When asked whether Lawrence had provided financial support to JL during the five months before the accident, Engler said he was not sure, but he also said that Lawrence had assisted with JL's hair, nails, and occasionally clothing, and she had done what she could with what she had. Engler testified that Lawrence provided JL with food and clothing when JL stayed with Lawrence and her mother. However, Lawrence received food stamps and Engler did not know whether Lawrence's mother also provided food for JL. Engler did not think that Lawrence's mother also provided clothing for JL because it was mostly JL's aunt or JL's older sister who did. JL was covered under Engler's health insurance and he provided her with school supplies.

-16-

Plaintiff, Lawrence's brother, testified that Lawrence was employed part time as a housekeeper at a hotel but she did not have a bank account. Plaintiff was unaware whether Lawrence gave her mother any money for rent. Plaintiff also stated that in the six months before the accident, Lawrence resided at a shelter provided by a mission to help her qualify for housing assistance. Plaintiff stated that Lawrence bought clothes for JL. According to plaintiff, however, at the time of the accident, JL spent only occasional weekends at the home Lawrence shared with her mother.

Plaintiff also relies in part on testimony that Engler provided financial support to Lawrence's mother after the accident to argue that Lawrence must have been providing that amount of support. However, Engler testified that he provided Lawrence's mother money for food because JL stayed there because her summer school was located next to her grandmother's home. This later voluntary contribution after Lawrence's death, while JL resided with her grandmother full time, does not give rise to a reasonable inference that Lawrence provided such level of support when she was not financially responsible for JL.

The foregoing testimony, as well as Engler's explanation that the custody arrangement and Lawrence's lack of any child support obligation were designed to allow Lawrence to save money to afford her own place, support the trial court's determination that JL was not entitled to survivor's benefits. Although Lawrence may have provided some support for JL before the accident, no genuine issue of material fact existed that JL "regularly" received support from Lawrence at the time of Lawrence's death, as required under MCL 500.3110(1)(c). Ignoring the word "regular" in MCL 500.3110 would render that term surplusage or nugatory, which this Court will not do. *People v Pinkney*, 501 Mich 259, 282; 912 NW2d 535 (2018).

Plaintiff also argues that the trial court erred when it found no genuine issue of material fact regarding whether he was entitled to recover for reasonably incurred replacement services. An insured bears a burden of proving by a preponderance of the evidence whether the expenses were reasonable and necessary. *Douglas v Allstate Ins Co*, 492 Mich 241, 269; 821 NW2d 472 (2012). Whether an expense is reasonably necessary is reviewed under an objective standard. *Id.* at 265. When asked what activities or support Lawrence used to provide that he was now providing, Engler stated that Lawrence used to braid JL's hair. To the extent that recovery for this service might be appropriate, plaintiff presented no evidence to show how often this occurred or how much others charged for such a service. Without such evidence, plaintiff cannot show that the trial court erred.

Affirmed.

/s/ Stephen L. Borrello
/s/ Michael J. Kelly
/s/ James Robert Redford

-17-