*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
March 21, 2024

Plaintiff-Appellee,

v

No. 359358
St. Clair Circuit Court

DONALD JOHN MCCONNELL,

LC No. 20-002026-FH

Defendant-Appellant.

Before: GADOLA, C.J., and K. F. KELLY and MURRAY, JJ.

PER CURIAM.

Defendant was convicted, following a jury trial, of involuntary manslaughter, MCL 750.321, second-degree child abuse, MCL 750.136b(3), possession of a controlled substance, MCL 333.7403(2)(b)(*i*), and maintaining a drug house, MCL 333.7405(1)(d). The trial court sentenced defendant as a second-offense habitual offender, MCL 769.10, to concurrent prison terms of 7 to 22½ years for the manslaughter conviction, 10 to 15 years for the child abuse conviction, and 365 days each for the convictions of possession of a controlled substance and maintaining a drug house, with credit ultimately for 390 days served. For the reasons set forth in this opinion, we affirm.

## I. BACKGROUND

Defendant's convictions arise from the death of his two-month-old infant son, who died while sleeping in a bed with defendant. In a police interview, defendant acknowledged that he was a methamphetamine user and he admitted using the drug on the morning that he placed the child on his stomach in bed with him. Defendant fell asleep at approximately 10:00 a.m. and woke up after 4:00 p.m., when the child's mother returned home. At that time, the child was cold, unresponsive, and his face and chest were dark. Emergency responders arrived at the house but determined that the child was deceased.

Evidence was presented that the bed in which the child was sleeping was unsafe for an infant because of its soft mattress and the presence of many blankets and pillows on the bed. A crib was in the bedroom, but it did not appear to have been used. An autopsy revealed the presence of methamphetamine in the child's system, but the medical examiner could not determine how it

-1-

entered his system. The medical examiner believed that both the unsafe sleeping situation that the child was placed in and the toxicity of the methamphetamine played some role in the child's death, but he could not determine the actual mechanism of death and could not say with any degree of medical certainty that the methamphetamine was a cause of the child's death.

At trial, the prosecution presented alternative theories of defendant's guilt of involuntary manslaughter, arguing that (1) defendant caused the child's death by gross negligence, and (2) defendant had a legal duty to care for his child and was grossly negligent in performing that duty, causing the child's death. The trial court instructed the jury on these alternative theories and gave a general unanimity instruction. Defendant did not request, and the trial court did not provide, a special unanimity instruction advising the jury that it was required to unanimously agree on a particular theory of guilt to find defendant guilty of involuntary manslaughter.

## II. FAILURE TO GIVE A SPECIFIC UNANIMITY INSTRUCTION

Defendant first argues that he was denied his right to a unanimous jury verdict because the prosecution argued two alternative theories of his guilt of involuntary manslaughter and the trial court failed to provide a specific unanimity instruction advising the jury that it was required to unanimously agree on one of the two theories.

Although we generally review instructional error arguments de novo, *People v Spaulding*, 332 Mich App 638, 652; 957 NW2d 843 (2020), because defendant never requested a specific unanimity instruction, this argument is unpreserved, *People v Everett*, 318 Mich App 511, 526; 899 NW2d 94 (2017). We review this unpreserved issue for plain error affecting defendant's substantial rights. *Spaulding*, 332 Mich App at 652-653. As explained in *Spaulding*:

> "To avoid forfeiture under the plain error rule three requirements must be met: 1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights." [*People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999)]. Reversal is warranted only if the plain error resulted in the conviction of an innocent defendant or if "the error seriously affected the fairness, integrity, or public reputation of judicial proceedings independent of the defendant's innocence." *Id.* (quotation marks, citation, and brackets omitted). [*Spaulding*, 332 Mich App at 653.]

In reviewing an instructional error argument, this Court "examines the instructions as a whole, and, even if there are some imperfections, there is no basis for reversal if the instructions adequately protected the defendant's rights by fairly presenting to the jury the issues to be tried." *People v Dumas*, 454 Mich 390, 396; 563 NW2d 31 (1997). "In order to protect a defendant's right to a unanimous verdict, it is the duty of the trial court to properly instruct the jury regarding the unanimity requirement." *People v Cooks*, 446 Mich 503, 511; 521 NW2d 275 (1994); see also MCR 6.410(B) ("A jury verdict must be unanimous.").

A general unanimity instruction is generally sufficient to protect a defendant's right to a unanimous verdict. *People v Chelmicki*, 305 Mich App 58, 68; 850 NW2d 612 (2014). "However, a specific unanimity instruction may be required in cases in which 'more than one act is presented

as evidence of the actus reus of a single criminal offense' and each act is established through materially distinguishable evidence that would lead to juror confusion." *Id*.

*People v Albers*, 258 Mich App 578; 672 NW2d 336 (2003), is analogous and controls. In that case the defendant was convicted of involuntary manslaughter after her six-year-old son obtained a lighter and started a fire in the apartment complex, resulting in the death of a 22-month-old child who resided in another apartment. *Id*. at 580. As in this case, the prosecution presented dual theories of the defendant's guilt of involuntary manslaughter: "(1) that defendant was grossly negligent in failing to exercise ordinary care to avert dangers posed by her child, CJI2d 16.10, or (2) that defendant was grossly negligent in failing to perform a legal duty to [the victim] under her lease agreement[,] CJI2d 16.13." *Id*. at 581. And, again as in this case, there was no request for a specific unanimity instruction. Without directly addressing whether a specific unanimity instruction was *required*, this Court concluded that the defendant was not entitled to relief under plain-error review. *Id*. at 584-586. This Court observed that sufficient evidence supported the defendant's conviction of involuntary manslaughter under the first theory. *Id*. at 585. Although the defendant attacked the second theory on the ground that he did not owe a legal duty to the child victim under her lease agreement, this Court held that the defendant was not entitled to relief "because the jury could only find her guilty under the second theory by making findings of fact that would also mean that she was guilty under the first theory, which was not dependent on any breach of duty to [the victim] under the lease agreement." *Id*. at 586. This Court reasoned:

> Critically, if a juror found guilt under the second theory, the juror would also have found that [the victim] died as a result of defendant's failure to properly secure the lighter that [her child] used to start the fire. Under the circumstances of this case, there would be no rational difference between such a finding and the finding required for conviction under the first theory that [the victim] died as a result of defendant keeping an accessible lighter in her apartment with knowledge of her son's propensity to play with lighters and start fires. In order to convict under either theory, the jury would have had to find that [defendant's son] obtained a lighter that defendant left unsecured in the apartment. In convicting defendant, it would have had to have effectively made findings of fact that meant defendant was guilty under the first theory even if some or all jurors based their votes to convict on the second theory. [*Id*. at 587.]

Here, the trial court instructed the jury on the prosecution's alternative theories of involuntary manslaughter in accordance with M Crim JI 16.10 (involuntary manslaughter) and M Crim JI 16.13 (involuntary manslaughter - failure to perform a legal duty). In order to convict defendant of involuntary manslaughter, both theories required the jury to find that defendant acted in a grossly negligent manner which caused his child's death and the evidence offered in support of the two theories was not materially different. The principal distinction between the two theories was the origin of any duty of care. The first theory alleged that defendant was in a situation that required him to use ordinary care to avoid injury to another, whereas the second theory alleged that a duty of care arose from the existence of a legal duty owed by a parent to that parent's child. Unlike in *Albers*, defendant does not argue that he did not owe a legal duty of care as the parent of his child. Indeed, Michigan law is well settled that parents owe a legal duty of care to their child. See *Goodwin v Northwest Mich Fair Ass'n*, 325 Mich App 129, 141-142; 923 NW2d 894 (2018)

(recognizing that parents owe a duty of care and protection to their children, including a duty to supervise).

More significantly, this was not a case in which the alternative theories were based on materially distinct acts as evidence of the actus reus of the offense. As the trial court observed when it denied defendant's motion for a new trial, "[t]he evidence presented in support of each theory was, for all practical purposes, identical." The disputed issue at trial was whether defendant acted in a grossly negligent manner that caused his child's death. This issue was common to both theories and the same evidence was offered to establish defendant's guilt under both theories. To convict defendant under the second theory—premised on the existence of a legal duty of care—the jury would have had to make findings of fact commensurate with the first theory, specifically, that defendant, in spite of being aware of a legal duty of care owed to his child, willfully neglected that duty and acted in a manner that rose to a level of gross negligence that caused his child's death. Similar to *Albers*, 258 Mich App at 587, "there would be no rational difference between such a finding and the finding required for conviction under the first theory." Thus, in convicting defendant, the jury "would have had to have effectively made findings of fact that meant defendant was guilty under the first theory even if some or all jurors based their votes to convict on the second theory." *Id*. Under these circumstances, the trial court's failure to provide a specific unanimity instruction did not amount to plain error.

## III. EFFECTIVE ASSISTANCE OF COUNSEL

Defendant asserts that trial counsel was ineffective by (1) failing to request a specific unanimity instruction, and (2) failing to consult an expert and failing to call an expert witness at trial to refute testimony by the prosecution's expert regarding the cause of the child's death.

The trial court rejected defendant's ineffective-assistance arguments after conducting a *Ginther*[1] hearing. "The question whether defense counsel performed ineffectively is a mixed question of law and fact; this Court reviews for clear error the trial court's findings of fact and reviews de novo questions of constitutional law." *People v Trakhtenberg*, 493 Mich 38, 47; 826 NW2d 136 (2012).

In *People v Randolph*, 502 Mich 1, 9; 917 NW2d 249 (2018), the Court explained:

[E]stablishing ineffective assistance requires a defendant to show (1) that trial counsel's performance was objectively deficient, and (2) that the deficiencies prejudiced the defendant. Prejudice means "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." [Citations omitted.]

---

[1] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

## A. FAILURE TO REQUEST A SPECIFIC UNANIMITY INSTRUCTION

We disagree that defense counsel's failure to request a specific unanimity instruction amounts to ineffective assistance of counsel. Initially, as discussed above, defendant has not established that a specific unanimity instruction was necessary where the prosecution did not rely on materially distinct acts to support the alternative theories of involuntary manslaughter. Consistent with this principle, at the *Ginther* hearing defense counsel explained that he did not request a specific unanimity instruction because "the same elements are contained in either theory" and the jury would "have to make the . . . the same finding on the elements to convict under either theory." Defendant has not established that counsel's failure to request a specific unanimity instruction was objectively unreasonable.

Furthermore, as already explained, because a finding of guilt under the theory premised on the existence of a legal duty of care necessarily would have required jurors to find the elements necessary to convict defendant under the alternative theory, there is no reasonable probability that a specific unanimity instruction, had one been requested and given, would have affected the outcome of defendant's trial. Accordingly, defendant cannot establish that he was prejudiced by counsel's failure to request a specific unanimity instruction.

## B. FAILURE TO CONSULT OR CALL AN EXPERT WITNESS

Defendant also argues that trial counsel was ineffective by failing to consult an expert and failing to call an expert at trial to refute testimony by the prosecution's expert regarding the cause of his child's death.

Decisions regarding what witnesses to call are generally considered matters of trial strategy. *People v Traver (On Remand)*, 328 Mich App 418, 428; 937 NW2d 398 (2019). "[A] defendant must overcome the strong presumption that counsel's performance constituted sound trial strategy." *People v Thurmond*, ___ Mich App ___, ___; ___ NW3d ___ (2023) (Docket No. 361302); slip op at 12. While this Court will not second-guess trial counsel's professional judgment with the benefit of hindsight, it also will not insulate trial counsel's performance from judicial scrutiny by characterizing it as trial strategy. *Id*. "A sound trial strategy is one that is developed in concert with an investigation that is adequately supported by reasonable professional judgments." *People v Grant*, 470 Mich 477, 486; 684 NW2d 686 (2004). Thus,

> "[s]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. . . . [C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." [*Id.* at 485, quoting *Strickland v Washington*, 466 US 668, 690-691; 104 S Ct 2052; 80 L Ed 2d 674 (1984).]

Defendant argues that defense counsel was ineffective for failing to consult or call an expert to refute the medical examiner's testimony regarding the cause of the infant child's death. However, at trial the medical examiner, Dr. Daniel Spitz, testified that the cause of the child's death was indeterminate, though he believed that both the child's unsafe sleep environment and the toxicity of the methamphetamine found in the child's body likely played some role in the

child's death. In support of this ineffective-assistance argument, defendant submitted reports from Dr. Kenneth Blick, Ph.D, who is board-certified in clinical chemistry and toxicology, clinical pathology, and laboratory testing, and Dr. Douglas Smith, a retired professor of pathology, who was board-certified in anatomic and clinical pathology, with a subspecialty board certification in blood banking and transfusion medicine. Both doctors concluded that the methamphetamine in the child's blood was a nontoxic amount and did not contribute to his death.

Initially, the record does not support defendant's argument that defense counsel failed to consult or investigate the possibility of calling an expert. At the *Ginther* hearing, defense counsel testified that he consulted with Dr. Charles Simpson, a board-certified neuropsychopharmacologist and research scientist, after Dr. Spitz testified at defendant's preliminary examination that he classified the child's death as "sudden unexpected death in infancy associated with hazardous sleeping environment," with methamphetamine toxicity as "a contributory cause of death." However, Dr. Spitz admitted that "[i]t's not entirely clear the effects of that methamphetamine on the child," other than that it was "an abnormal finding . . . that could have detrimental effects on the child." According to defense counsel, Dr. Simpson advised him that there were no studies to support a conclusion regarding the effects of methamphetamine on an infant or small child, and therefore, Dr. Simpson could not provide testimony to counter Dr. Spitz's testimony regarding the uncertain impact of the methamphetamine on the child. Defense counsel explained that because Dr. Spitz admitted that the effect of the methamphetamine on the child was unclear, and Dr. Simpson did not disagree, there was no need to call an expert because he would be able to "get what I needed to from Spitz during trial, get the information that would actually help, help our case and help [defendant]." Indeed, the record discloses that, in his cross-examination of Dr. Spitz at trial, defense counsel elicited that Dr. Spitz was not a toxicologist, that the level of methamphetamine in the child's system was relatively low, that Dr. Spitz did not know how the methamphetamine entered the child's system, that Dr. Spitz was not aware of any studies addressing the effect of methamphetamine on younger children or infants, and that it was "difficult to know" the exact impact that the methamphetamine had on the two-month-old child. Counsel further elicited Dr. Spitz's admission that he could not say with any medical degree of certainty that methamphetamine caused the child's death.

At the *Ginther* hearing, defense counsel explained that he was aware of Dr. Smith, but he did not consider calling him as an expert because he did not consider him to be reputable. And he would not have called Dr. Blick because Dr. Blick's testimony tended to minimize the significance of the methamphetamine in the child's system, which counsel did not believe would have been viewed favorably by a jury. Further, Dr. Blick was not able to refer to studies involving the effects of methamphetamine on infants and children, which he agreed would render his proposed testimony "highly impeachable." Just as significant, counsel believed that his cross-examination of Dr. Spitz would be able to cover any points that an expert could have provided, which was that the effect of the methamphetamine found in the child's system could not be determined and that even Dr. Spitz was unable to conclude that the methamphetamine was a cause of the child's death.

In sum, the record indicates that trial counsel made a strategic decision not to call an expert witness at trial, and that this decision was made after (1) consideration of Dr. Spitz's preliminary examination testimony, (2) consultation with Dr. Simpson, who defendant does not dispute was a qualified expert, and (3) reasonably believing that he would be able to establish on cross-examination, which he did, that the effect of the methamphetamine exposure on the child was

uncertain and it could not be determined to a reasonable degree of medical certainty that the methamphetamine exposure was a cause of the child's death.

Unlike in *Grant*, 470 Mich 477, the record in this case reflects that trial counsel investigated the possibility of presenting expert testimony regarding the cause of the child's death, but reasonably determined, after consulting a qualified expert and considering the medical examiner's equivocal preliminary examination testimony, that he would be able to establish on cross-examination that the effect of the methamphetamine exposure on the child was uncertain and that it could not be determined to a reasonable degree of medical certainty that the methamphetamine exposure was a cause of the child's death, and that any testimony by a defense expert would likely be consistent with such testimony. Accordingly, the trial court did not err by ruling that trial counsel's decision not to call an expert witness at trial was objectively reasonable.[2]

## IV. SENTENCE CREDIT

When defendant filed his original brief on appeal, he challenged the trial court's award of 365 days of sentence credit under MCL 769.11b and argued that he was actually entitled to an award of 390 days of credit. After this Court granted defendant's motion to remand, the parties agreed that defendant was entitled to 390 days of credit for time served and the trial court entered an amended judgment of sentence reflecting that amount of credit. Because defendant has already received the relief he requested, this issue is moot and need not be considered further. See *People v Billings*, 283 Mich App 538, 548; 770 NW2d 893 (2009).

Affirmed.

/s/ Michael F. Gadola
/s/ Kirsten Frank Kelly
/s/ Christopher M. Murray

---

[2]After this Court granted defendant's motion to remand, the trial court entered an amended judgment of sentence reflecting the proper amount of credit. Because defendant has already received the relief he requested, this issue is moot and need not be considered further. See *People v Billings*, 283 Mich App 538, 548; 770 NW2d 893 (2009).